# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) SINCERE TERRY, (2) MIA HOGSETT, (3) TYREKE BAKER, (4) PRESTON NABORS, (5) TREVOUR WEBB, and (6) AUSTIN MACK,<br><br>      Plaintiffs,<br><br>v.<br><br>(1) CITY OF OKLAHOMA CITY, OKLAHOMA, a municipality, (2) THOMAS VANNORT, in his individual capacity, (3) DAVID PRATER, in his individual and official capacities, and (4) DEFENDANT DOES 1-10, in their individual capacities,<br><br>      Defendants. | No.<br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiffs Sincere Terry, Mia Hogsett, Tyreke Baker, Preston Nabors, Trevour Webb, and Austin Mack bring this lawsuit against Defendants City of Oklahoma City, Oklahoma, Thomas VanNort (in his individual capacity), Oklahoma County District Attorney David Prater (in his individual and official capacities), and Does 1 through 10 (officers in their individual capacities) for violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 5

JURISDICTION AND VENUE ............................................................................... 8

PARTIES ................................................................................................................. 8

FACTUAL ALLEGATIONS .................................................................................. 11

I.    Oklahoma City's Well-Documented
History of Racially Motivated Police Violence ............................................... 11

II.   A Generation of Activists in Oklahoma City .................................................. 12

III.  George Floyd's Murder Spurs Plaintiffs to Action ......................................... 14

     A.   Plaintiffs actively and visibly protested the murder
of George Floyd and the OCPD's racially biased
policing practices in May and June 2020. ......................................... 15

     B.   A group of activists coalesce together as
"the Movement" and continue daily protests. ................................. 22

IV.  The Mural Event ............................................................................................. 28

     A.   Plaintiffs and others secure a permit to paint a mural
outside the OCPD headquarters to celebrate Black lives. ............... 28

     B.   On June 23, 2020, OCPD Sgt. Wald attempted
to drive through the mural barricades. .............................................. 31

V.    Plaintiffs attempt to complain about Sgt. Wald's conduct
to the OCPD and get arrested for disorderly conduct. ................................... 36

     A.   OCPD arrests Plaintiffs for attempting to
complain about Sgt. Wald's conduct. ............................................... 36

     B.   The probable cause affidavits justifying the disorderly conduct
arrests contain misrepresentations and material omissions............. 41

VI.  Defendants Prater, VanNort, and the City conspire to retaliate
against Plaintiffs for their exercise of First Amendment Rights. ................... 43

     A.   Defendants Prater and VanNort decide to charge Plaintiffs with
felony incitement to riot in connection with the mural painting...... 43

B.     DA Prater and the OCPD obtained unreasonable arrest warrants predicated on clear misrepresentations and omissions ...... 49

      1.     Elements of an Incitement to Riot charge ............................. 50

      2.     The Affidavits Failed to Establish Probable Cause .............. 51

      3.     The Affidavits contain knowing and/or reckless misrepresentations and omissions. .......................... 54

C.     DA Prater and the OCPD worked together to charge other protestors with felonies arising out of protected First Amendment activity ..... 56

VII.    Each Plaintiff was subjected to continued retaliatory action by the OCPD as a result of engaging in protected First Amendment activity. .......... 57

   A.     Plaintiffs learn of the incitement charges while protesting police violence; news of the charges spreads and ends the protest .. 57

   B.     Defendants obtain arrest warrants and unreasonably high bonds against Plaintiffs. ..................................... 59

   C.     Defendants call in the U.S Marshal Service to effect Plaintiffs' arrests. ................................................... 61

      1.     The Unreasonable Pursuit of Plaintiffs Mack and Terry and Arrest and Detention of Sincere Terry ................ 62

      2.     The Unreasonable Arrest and Detention of Mia Hogsett ...... 63

      3.     The Unreasonable Arrest and Detention of Tyreke Baker .... 65

      4.     The Unreasonable Arrest and Detention of Preston Nabors . 66

      5.     The Unreasonable Arrest and Detention of Trevour Webb .. 68

      6.     The Unreasonable and Racially Discriminatory Issuance of a Warrant Against Austin Mack ....................... 70

   D.     Defendants have chilled Plaintiffs' speech and caused lasting harm. ..................................................... 71

      1.     Plaintiff Terry ....................................................................... 73

      2.     Plaintiff Hogsett ................................................................... 75

      3.     Plaintiff Baker ...................................................................... 77

      4.     Plaintiff Nabors .................................................................... 78

5.    Plaintiff Webb ................................................................... 78

6.    Plaintiff Mack.................................................................... 79

VIII.  The City adopted and continues to maintain a policy, practice and/or custom of suppressing the First Amendment activity of racial justice advocates. ..... 81

A.    Chief Gourley was on notice of OCPD's violations of protestors' First Amendment Rights and repeatedly failed to act.... 82

B.    The targeting of Plaintiffs is part of a broader pattern of OCPD retaliation against racial justice protestors who criticize the police. 86

CLAIMS FOR RELIEF ........................................................................... 91

COUNT I – Violation of the First Amendment
(Freedom of Speech, Freedom of Press,
Retaliatory Arrest and Prosecution) ............................................... 91

COUNT II – Violation of the First Amendment
(Freedom to Petition)..................................................................... 94

COUNT III – Violation of the First Amendment
(Content and/or Viewpoint Discrimination).................................... 96

COUNT IV – Violation of the Fourth Amendment
(False Arrest) ................................................................................. 98

COUNT V – Violation of the Fourth Amendment
(Malicious Prosecution)................................................................. 99

COUNT VI – 42 U.S.C. § 1983
(Conspiracy to Violate Constitutional Rights) .............................. 100

COUNT VII – Violation of the Fourteenth Amendment
(Equal Protection)........................................................................ 102

RELIEF REQUESTED ....................................................................... 104

**INTRODUCTION**

1.      The murder of George Floyd ignited a nation-wide protest movement and
renewed demands for racial justice across all sectors of public life.  In May and June
2020, motivated by repeated incidents of violence against people of color at the hands of
police officers around the country and in Oklahoma, young activists in Oklahoma City
joined people around the nation in exercising their constitutional right to protest to effect
change.  The protestors marched and chanted slogans for racial justice, police
accountability, and a society free of police violence.  All shared a common goal: to end
racially motivated police violence and misconduct, both locally and nationally.  The
Oklahoma City Police Department ("OCPD") met these protestors with brutal repression
and violence.

2.      Every night following George Floyd's murder, a small group of activists
organized, lead, and participated in protests, journalism, murals, and community
meetings to express their criticism of racist police violence generally, and the Oklahoma
City Police Department's long history of racial violence and lack of accountability in
particular.  They called themselves "the Movement" to distinguish themselves as a
young, independent collective in solidarity with the larger movement for racial justice.  It
did not take long for the Oklahoma City Police Department ("OCPD") to recognize these
activists and begin surveilling, targeting, and harassing them because of their protest
activity critical of the OCPD.

3.      In late June, Movement members and other activists obtained a permit to
paint a mural celebrating Black lives outside the OCPD headquarters.  On June 23, with

painting underway, an Oklahoma City police officer, Master Sergeant Nicklas Wald ("Wald" or "Sgt. Wald"), attempted to drive his police cruiser past the protective barricades.  Certain of Plaintiffs implored Sgt. Wald to go around the permitted area and stood in front of his cruiser to keep it from moving forward.  Sgt. Wald refused and drove his car towards the protestors, but eventually backed up and left.

4.      The following day, some Plaintiffs returned to police headquarters to file a complaint against Sgt. Wald.  For approximately forty minutes, OCPD officers denied Plaintiffs entry to the building and refused to take their complaint.  OCPD officers subsequently arrested them for alleged disorderly conduct and detained them for ten to fifteen hours.

5.      Two days later, while attending another protest in nearby Edmond, Oklahoma, Plaintiffs learned that they would be charged with felony incitement to riot in connection with the Wald encounter.  Defendants sought to punish Plaintiffs for their First Amendment activity and deter Plaintiffs and others from engaging in protest activity critical of the OCPD.  Defendants based the arrest warrants and charges on flagrant falsehoods, misrepresentations, and omissions.  Defendants called in the U.S. Marshal Service to effectuate Plaintiffs' arrests.  All but Plaintiff Mack, who did not even attend the mural painting, were arrested, detained, and prosecuted.  Defendants smeared Plaintiffs in the media as "criminals" and "terrorists."  Ultimately, however, Plaintiffs pled guilty to misdemeanors.

6.      The arrests and charges stemmed from a deliberate policy, custom or practice of repressing racial justice protestors, and especially those critical of the OCPD,

for their political activism.  Beginning with the George Floyd protests, and continuing to this day, OCPD officers have employed a range of coercive tactics to silence the speech of Plaintiffs and others.  These tactics include posting the photos of racial justice protestors on the wall at police headquarters; subjecting racial justice protestors—but not others—to excessive force at rallies and mass gatherings; targeting racial justice protestors with felony arrests and prosecutions for engaging in protected First Amendment activity; and singling out racial justice protestors for unusually intensive traffic enforcement.

7.      OCPD's repressive tactics achieved their desired effect.  Plaintiffs—former leaders of the Movement—hang back at the edges of protests, if they attend at all.  And racial justice protests generally are smaller because many community members fear OCPD retaliation if they speak out.  Since their arrests, Plaintiffs do not engage in the full range of First Amendment expressive activity because they share these fears.  But if Plaintiffs felt safe, they would engage in protest as fully as before.

8.      Plaintiffs bring this civil rights action based on the retaliatory and discriminatory actions taken by Defendants against them for exercising their First Amendment rights under the United States Constitution, and for violations of the Fourth and Fourteenth Amendments.  Plaintiffs seek redress for their injuries and an order mandating Defendants to refrain from targeting and harassing racial justice protestors, so that Plaintiffs and others have freedom to engage in the fundamental rights enshrined in the Constitution and foundational to our democracy: the rights to freedom of speech and

of the press, to peaceful assembly, to petition for redress of grievances, to freedom from unwarranted seizures by the government, and the guarantee of equal treatment.

## JURISDICTION AND VENUE

9.      This is an action for damages to provide for compensation and redress for the deprivation of rights and remedies as provided by 42 U.S.C. § 1983 and § 1988 and the First, Fourth, and Fourteenth Amendments to the Constitution of the United States of America.

10.     The Court has subject matter jurisdiction over federal questions pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) over Plaintiffs' causes of action arising under 42 U.S.C. § 1983.

11.     Venue is proper in the United States District Court for the Western District of Oklahoma pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are located in this state within the Western District.  Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in the Western District.

## PARTIES

12.     Plaintiff Sincere Terry is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.

13.     Plaintiff Mia Hogsett is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.

14.     Plaintiff Tyreke Baker is a citizen of the State of Oklahoma currently residing in Midwest City, Oklahoma.

15.     Plaintiff Preston Nabors is a citizen of the State of Oklahoma currently residing in Mustang, Oklahoma.

16.     Plaintiff Trevour Webb is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.

17.     Plaintiff Austin Mack is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.

18.     Defendant the City of Oklahoma City ("Oklahoma City" or the "City") is a municipal corporation organized under the laws of the state of Oklahoma.  Oklahoma City has capacity to sue and be sued in its own name.  The OCPD is a department and agency of the City established under local law.  The City is responsible for the OCPD's policies, practices, and conduct, including its supervision and training of officers and compliance with federal law.  At all relevant times, OCPD Chief Wade Gourley was and is the City's chief policymaking official with final decision-making authority over the policies, practices, customs, conduct, supervision and training of the OCPD.

19.     Defendant Thomas VanNort is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.  Defendant VanNort is a Detective and officer with the Oklahoma City Police Department.  At all relevant times, Defendant VanNort acted within the scope of his employment and under color of state law.  He is sued in his individual capacity.

20.     Defendant David Prater is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.  Defendant Prater has been the District Attorney of Oklahoma County since 2007 and was the district attorney of Oklahoma County at all

relevant times.  Defendant Prater was and is the chief policymaking official for the Office

of the Oklahoma County District Attorney.  At all relevant times, he acted within the

scope of his employment and under color of state law.  Defendant Prater is sued in his

individual and official capacities.

21.     Defendant Does 1-10 are citizens of the State of Oklahoma currently

residing in Oklahoma City, Oklahoma.  Defendant Does 1-10 are individuals employed

by or agents of the OCPD whose true and correct names are not now known but who

were involved with the refusal to take Plaintiffs' complaints and their subsequent arrest

and detention for disorderly conduct.  Defendant Does 1-10's fictious names will be

substituted for their true and correct names when ascertained.  At all relevant times,

Defendant Does 1-10 acted within the scope of their employment and under color of state

law.  They are sued in their individual capacities.

**FACTUAL ALLEGATIONS**

I.    **Oklahoma City's Well-Documented
      History of Racially Motivated Police Violence**

22.    The State of Oklahoma has a long and complicated history of racial tensions and police brutality including, most notably, the 1921 Tulsa Race Massacre. More than 100 years later, these racial tensions persist.  Between 2015 and 2021, police in Oklahoma committed 165 fatal shootings.  Of these shootings, 32 involved Black individuals.  Roughly 19 percent of fatal shootings affect Black people, while only 7.8 percent of Oklahoma's population is Black.[1]  Between 2013 and 2021, a Black person in Oklahoma was 5.1 times more likely to be killed by police than a White person.

23.    Moreover, according to a peer-reviewed study in *The Lancet*, one of the world's most prestigious medical journals, Oklahoma had the highest mortality rate from police violence of all 50 states from 1980 through 2018, and the highest rate of police violence against Black people.[2]  During that period, Oklahoma also had the highest rate of underreporting police killings out of all states—government reports misclassified or failed to report almost 84% of police killings in the state.

---

[1] Racial Disparities in Policing: An Advisory Memorandum of the Oklahoma Advisory Committee to the U.S. Commission on Civil Rights, at 6 (June 2021), https://www.usccr.gov/files/2021/05-26-OK-SAC-Advisory-Memorandum-Racial-Disparities-in-Policing.pdf.

[2] GBD 2019 Police Violence US Subnational Collaborators, *Fatal police violence by race and state in the USA, 1980-2019: a network meta-regression*, Lancet 2021, 398: 1239, 1244-1247 (Oct. 2, 2021), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)01609-3/fulltext

24.     The OCPD itself also has a long and violent history of discriminatory policing.  The Oklahoma City Police Department has the second highest rate of police killings in the nation.[3]  Several killings and other actions by the OCPD have been especially controversial and have engendered significant publicity:

    a.     In September 2017, police responding to a hit-and-run accident observed Magdiel Sanchez on his front porch holding a metal pipe.  Sanchez failed to comply with police commands.  OCPD officers shot him dead, despite shouts from neighbors that he was deaf.

    b.     In March 2019, police shot fourteen-year-old Lorenzo Clerkley Jr. in the leg while he was playing with friends at an abandoned house.  After shooting Clerkley, officers reportedly dragged him over broken glass to the front of the house where an officer checked his wounds and said, "You're okay.  You're not gonna die."

    c.     On May 20, 2019, OCPD officers pinned 41-year-old Black Oklahoma City resident, Derrick Elliott Olie Scott, to the ground in response to a report of a Black man with a gun.  Three police officers held Scott down for approximately thirteen minutes.  Video footage shows Scott pleading to the officers: "I can't breathe!  Please!  Help me!  I can't breathe."  Scott was pronounced dead at an Oklahoma City hospital about an hour after his arrest.  The autopsy report listed the probable cause of death as a collapsed lung.

## II.     A Generation of Activists in Oklahoma City

25.     Plaintiffs are all young people who grew up in or around Oklahoma City aware of the culture of police violence, especially towards Black and Brown people.

---

[3] Ben Felder, "Chief calls report 'extremely flawed' but data appears accurate in labeling OKC with second highest police killing rate," *The Frontier* (June 3, 2020), https://www.readfrontier.org/stories/chief-calls-report-extremely-flawed-but-data-appears-accurate-in-labeling-okc-with-second-highest-police-killing-rate/ (relying on data compiled from https://mappingpoliceviolence.org/).

26.     Sincere Terry is a twenty-year-old Black woman who has lived in Oklahoma City her entire life.  Terry has been involved in community advocacy since she was twelve years old, when she attended protests arising out of the killing of Trayvon Martin in 2012 in Florida.  Prior to the events relevant to this action, Terry worked three jobs and was a college student.

27.     Mia Hogsett is a thirty-three-year-old White and Mexican woman who was born in Oklahoma City.  She has lived in Oklahoma City on and off for most of her life.  Prior to the events relevant to this action, Hogsett was employed as a hairdresser.

28.     Tyreke Baker is a twenty-two-year-old Black man who resides in Midwest City, Oklahoma.  Baker is the founder and editor-in-chief of the registered independent news journal *The Black Times*.  In this capacity, he covers racial justice issues in Oklahoma City and nationally, including abusive tactics by the OCPD and police generally that harm communities of color.  Baker is an artist who engages in photography, filmmaking, writing, and playing his violin and cello.  Baker is also the Vice President of the Charl'e Monae Foundation, a non-profit community outreach organization that helps grieving families.  He is a founding member of the March for Our Rights and a member of the Coalition of Community Leaders.  Since the George Floyd protests, Plaintiff Baker has continuously documented and reported on racial justice protests throughout Oklahoma City and nationally, including protests over OCPD's killing of Black and Latinx men.

29.     Preston Nabors is a twenty-five-year-old Hispanic man who was born in Oklahoma City and resides in Mustang, Oklahoma.  Prior to the events relevant to this

action, Nabors was unemployed after he was laid off from his job as a construction

worker at the start of the COVID-19 pandemic.  Nabors began protesting police violence

and advocating for racial justice after the murder of George Floyd by Minneapolis police.

30.     Trevor Webb is a twenty-eight-year-old Black man and has lived in

Oklahoma City for 15 years.  He is married with three children, including a three-month

old daughter, three-year-old daughter, and five-year-old son.  At the time of the events

relevant to this action, Webb was employed at a marijuana dispensary.  Webb has been

involved in community activism for approximately five years.  Starting during the

George Floyd protests in 2020, Webb began a community cop watch program to monitor

the OCPD's interactions with people of color that ran until June 2021.

31.     Austin Mack is a twenty-six-year-old Black man who resides in Oklahoma

City, Oklahoma.  Prior to the events relevant to this action, Mack was employed as a

delivery-person for Amazon.com.  Since May 2020, Mack has attended, organized, and

lead protests in support of racial justice.

**III.    George Floyd's Murder Spurs Plaintiffs to Action**

32.     On May 25, 2020, George Floyd, a 46-year-old Black man from

Minneapolis, Minnesota, was murdered by Derek Chauvin, an on-duty, uniformed

member of the Minneapolis Police Department.  Chauvin knelt on Floyd's neck for over

nine minutes as Floyd suffocated to death.  Three other police officers watched while

Floyd was murdered, two of whom prevented onlookers from intervening.  For the final

two minutes, as Chauvin continued to crush Floyd's neck, Floyd lay motionless.  His

heart had already stopped beating.  Chauvin has since been convicted of Floyd's murder and sentenced to over twenty-two years in prison.

33.     The murder was captured in a video by Darnella Frazier, which was distributed widely on social media and news channels.  Floyd's dying words, "I can't breathe," became a rallying cry.  The murder sparked national and world-wide outrage and protests erupted over the continued killings of Black and Brown people at the hands of police officers, including in Oklahoma City.

34.     Because of the long history of police violence and racially biased policing in Oklahoma City, Floyd's killing was especially relevant to residents of Oklahoma and to Plaintiffs in particular.

> A.     Plaintiffs actively and visibly protested the murder
> of George Floyd and the OCPD's racially biased
>  policing practices in May and June 2020.

35.     Hundreds of Oklahomans joined the international calls for racial justice and an end to police brutality following the murder of George Floyd.  Shortly after Floyd's murder, Plaintiff Mack travelled to Minneapolis to join protestors there.

36.     In Oklahoma City, a grassroots protest began on the intersection of North Classen Blvd. and 23rd St. NW in the evening of May 30, 2020.  Protestors marched south down Classen to the OCPD headquarters.  Almost immediately after the protest began, OCPD began arresting protestors who were chanting messages critical of the police, and the OCPD in particular.  During the march, several OCPD cruisers drove at high speeds with lights flashing down adjacent side streets toward the crowd of protesters, abruptly stopping just short of the crowd and revving their engines, in an effort

to intimidate protesters. OCPD officers also used unreasonable and excessive force against racial justice protestors.  When the protesters arrived at OCPD headquarters, dozens of officers in riot gear awaited them.  The officers stood around the protesters, and between protesters and the building.  OCPD officers continued to make arrests and use force without provocation throughout the night.

37.     Tensions intensified after 11:30 p.m., with a few protesters—but not Plaintiffs—throwing empty water bottles toward OCPD officers.  OCPD deployed tear gas and shot bean bag rounds directly at protesters to disperse the crowd, stating over loudspeakers that this was an unlawful protest.  As many protesters began to flee to avoid the tear gas and bean bag rounds, OCPD officers standing outside of the jail continued to shout at the crowd, asking protesters why they were protesting police violence in Oklahoma City when it wasn't the OCPD that murdered George Floyd.

38.     Some protesters began to shout back at these officers.  Several OCPD officers drew their guns and pointed them at the crowd, yelling that protesters must leave the scene and go home.  Throughout the night, multiple peaceful protestors sustained injuries from tear gas cannisters, bean bag rounds, and other munitions, even as the fled from officers.  Some protesters remained until the morning hours of May 31, 2020. OCPD continued deploying tear gas and shooting bean bag rounds into the crowd long after all instances of property damage had ceased.  Late in the night, some protesters began setting off fireworks, jumping on and setting fire to an Oklahoma City police car, and breaking the windows of the first floor of the Oklahoma County Jail and a nearby

bail bonds company.  While this occurred, the majority of protestors continued to peacefully protest.

39.     Plaintiffs Terry, Hogsett, Webb, and Mack attended the protest on May 30, 2020.  Each of these Plaintiffs protested peacefully throughout the action.  None of these Plaintiffs knew each other before this day.  Plaintiff Hogsett injured her ankle in the process of fleeing the OCPD's tear gas.  Plaintiff Hogsett witnessed OCPD hit a peaceful protester in the ankle with a tear gas canister.  Hogsett lunged into the cloud of smoke that erupted around her and the injured protester, pulling the injured protester away from the tear gas.

40.     Plaintiff Mack was hit by a bean bag round while lawfully protesting.  He witnessed OCPD hit an additional four or five protesters with bean bag rounds.  OCPD also hit Plaintiff Mack with tear gas, burning his skin and numbing his face.  He witnessed other peaceful protesters hit with tear gas.  He was volunteering as a medic and assisted the injured protesters, pouring milk into their burning eyes to alleviate the symptoms of the tear gas.  Other protesters poured milk into Mack's eyes to assist him with the burning tear gas.

41.     On May 31, 2020, Black Lives Matter Oklahoma City ("BLM OKC") hosted a protest outside Nappy Roots Bookstore on the corner of NE 36th St. and N Kelly Ave. responsive in part to the events of May 30.  After BLM OKC's planned programing, protesters began marching south to the Capitol and then farther south back to OCPD headquarters where they again encountered OCPD officers in riot gear.  The crowd steadily grew, and around 9:40 p.m. Mayor David Holt issued a state of emergency and

set a curfew to go into effect at 10:00 p.m.  But even before, starting around 9:10 p.m., OCPD began to deploy tear gas and bean bag rounds directly into a peaceful crowd of protesters, causing multiple injuries.  Some of the protesters remained until the morning hours of June 1, 2020 as OCPD continued to use tear gas and bean bag rounds to disperse the crowd, without any provocation.  Again, officers pointed their guns at protestors.

42.     Dozens of OCPD officers responded violently to the peaceful protests, using unjustified arrests and unnecessary force.  For example, in one instance caught on video, OCPD officers brutally tackled and arrested a Black racial justice protestor, Aaron Snyder.  After the officers brought him to the ground, one police officer violently laid on top of him, holding him and pushing his head down to the concrete.  As bystanders gathered to document and protest the brutal arrest, two other officers stood in front pointing tasers at the crowd, bringing in a dog, readying their batons and riot gear, and one of the officers sprayed bystanding protesters as they documented and watched the incident.  In another incident on June 2, a video captures a peaceful racial justice protestor shot by bean bags in the testicles.  Other videos and testimony capture the OCPD inflicting serious physical injuries on protestors through these tactics, without provocation or justification.

43.     Plaintiffs attended the protest on May 31, 2020.  Plaintiff Baker filmed and documented the protest.  All Plaintiffs protested peacefully throughout the action, engaging in chants.

44.     Plaintiff Baker was surrounded by tear gas while lawfully protesting, feeling trapped by its burning cloud of smoke.  Plaintiff Webb, who has asthma, was also

caught in the tear gas, and was forced to get medical care because he was struggling to breathe. Plaintiff Terry stood at the front of the protest. OCPD hit her with tear gas, causing her to fall to the ground and feel like her insides were closing up. She witnessed OCPD hit other peaceful protesters with tear gas, causing them to fall to the ground gasping for air. The peaceful protesters hit included mothers and their small children. Around Plaintiff Terry, babies cried from inhaling tear gas. The tear gas left a rash all over Plaintiff Terry's body, lasting for several days.

45.     Plaintiffs Webb, Terry, and Baker observed officers intimidating them and other protestors by driving at high speeds toward and alongside the crowds with lights flashing. Plaintiffs Baker and Webb also observed OCPD officers pointing their guns at protesters. Plaintiff Hogsett primarily stood outside of the crowd due to her injured ankle and handed out water bottles to protesters. Officers repeatedly told protestors, including Plaintiffs, that they were engaged in an "unlawful assembly."

46.     Protesters, including Plaintiffs Terry and Mack, remained until the morning hours of June 1, 2020, as OCPD continued to use tear gas and bean bag rounds to disperse the crowd.

47.     Between May 30 and June 1, 2020, OCPD arrested approximately twenty-seven people—not including the Plaintiffs—for alleged crimes ranging from disorderly conduct and public intoxication to felony terrorism. According to video evidence, OCPD arrested multiple protestors while engaging in protected speech critical of the police and OCPD in particular. The charges against at least 16 people were declined, declined due to lack of predicate facts, or dismissed by the Court.

48.     At a related racial justice protest in Tulsa, Oklahoma on this same day—

May 31, 2020—a pickup truck drove through a crowd of protesters and injured multiple

people.  In reference to this horrific incident, several OCPD officers made comments and

posts on Facebook in the days that followed endorsing and making light of violence

against racial justice protesters.  One post featured a cartoon car running into protesters

and read "All Lives Splatter . . . Nobody Cares About Your Protest . . . Keep Your Ass

Out Of The Road." Another post featured a cartoon of one person kicking a protester,

captioned "Hospitalize Your Local Antifa Scumbag."

49.     On June 1, 2020, leaders of BLM OKC and other racial justice advocates

made statements at a press conference at the Oklahoma City Municipal Building calling

on Police Chief Wade Gourley to resign and demanding an apology from Gourley and

Mayor Holt for the OCPD's indiscriminate arrests and use of unlawful tactics towards

peaceful protestors.  The advocates also called for disciplinary action and termination of

all police officers who "violently attacked peaceful protesters and training for police de-

escalation tactics" as well as a release of all the protestors arrested in the previous nights.

In response, the Oklahoma City Fraternal Order of Police ("FOP") rallied with Chief

Gourley, who said he would not resign.

50.     Plaintiffs Baker, Mack, Nabors, Terry, and Webb all attended the protests

that followed on the evening of June 1, 2020.  Protesters continued to engage in peaceful

protest, marching in downtown Oklahoma City and gathering near police headquarters.

Plaintiffs Terry, Mack, and Webb observed OCPD officers again pointing their guns at

protesters.  The OCPD did not deploy tear gas or bean bag rounds during this protest, but tear gas cannons were visible and within reach of the police to use.

51.     On the afternoon of June 2, 2020, Young Democrats of Oklahoma and Plaintiff Terry hosted a vigil in the Myriad Botanical Gardens to honor the lives of Black people lost to police brutality, including the life of George Floyd.  Many racial justice protesters gathered downtown and walked to the Botanical Gardens for the vigil.  The event was peaceful, and protesters left the Myriad Gardens at nightfall.  Plaintiff Terry helped to plan and set up the event but did not attend.  Plaintiff Nabors attended the event.

52.     Protesters returned to OCPD headquarters the evening of June 2, 2020 in smaller numbers than the three previous nights.  The protest was peaceful, and people called on Mayor Holt to come and speak to them.  Around 9:30 p.m., Mayor Holt lifted the curfew.  Around 11:00 p.m., Mayor Holt came to speak with the peaceful protesters, particularly Plaintiff Terry, to begin a dialogue and hear their concerns.  Plaintiff Terry spoke directly with the Mayor and criticized the OCPD's violent and unlawful responses to protesters, including the unlawful use of tear gas and rubber bullets.  Plaintiff Terry also criticized the Mayor for initiating a curfew, stating that he did so without adequate notice to protesters, putting protesters at risk of harm.  In response, Mayor Holt claimed that he had no power to change the actions of the police department.

53.     Plaintiffs Terry, Baker, Nabors, and Mack were present at the protest on June 2, 2020.  Plaintiff Baker filmed and documented the event.  All Plaintiffs protested

peacefully throughout the action.  All Plaintiffs protested in the middle of the streets around OCPD Headquarters, along with the other protesters.

B. A group of activists coalesce together as "the Movement" and continue daily protests.

54. From around June 2, 2020 to June 20, 2020, protests in Oklahoma City continued daily.  After daytime demonstrations would wind down, a smaller group of around twenty to thirty young people, which included Plaintiffs, continued to meet and protest from around 7:00 p.m. to 7:00 a.m. every night around the courthouse and police headquarters.  The group did not know each other before the protests but got to know one another over the course of June 2020.  At some point, the group informally began to refer to themselves as "the Movement."

55. Every day during this time, each Plaintiff actively engaged in protesting in support of racial and social justice and against police and the OCPD's racist misconduct and violent policing tactics.  Plaintiff Baker actively played the additional roles of documentarian and journalist during these daily protests, filming and reporting on this activism, and the tactics employed by the OCPD, for *The Black Times* to accurately document the grassroots movement for police accountability and racial justice in Oklahoma City.

56. On June 7, 2020, Plaintiff Mack organized a community barbeque in Oklahoma City as a continued demonstration in opposition to police violence and in support of Black Lives.

57.     At all protests, Plaintiffs and other racial justice protesters made statements and chanted to protest the death of George Floyd, as well as the OCPD's racism, misconduct, and killing of Black people and people of color—and the absence of accountability.  During the protests, Plaintiffs and other protestors frequently held their hands up and chanted "hands up, don't shoot;" "Black lives matter;" "defund the police;" "not one more;" "how many more;" "no justice, no peace;" "say their names;" "fuck the police;" and "fuck twelve."[4]  Some protestors and Plaintiffs held signs that read "Stop Killing Black People," "Black Lives Matter," and "Say Their Names."  Protesters and Plaintiffs also periodically played a protest song, "Fuck tha Police" by N.W.A., over loudspeakers.  During the evening protests by Plaintiffs and other members of the Movement, they would also chant calls for Chief Gourley's resignation or demand that Chief Gourley come out of police headquarters to speak with them.  Plaintiffs often led marches and chants including "A city united will never go divided," "Racist cops have to go," and "Hands up, don't shoot."  Plaintiffs also livestreamed video of the protests on Facebook Live to invite others to join and to publicize their nightly racial justice protests.

58.     OCPD officers were present at every protest starting May 30, 2020 through at least June 20, 2020.  During the protests from May 30 to May 31, 2020, there were large numbers of OCPD officers present, both on foot and in patrol cars.  As protests continued into the first two weeks of June 2020, OCPD officers would be present in varying numbers at protests throughout the day and at every evening protest by Plaintiffs

---

[4] "Fuck twelve" is an anti-law enforcement chant.

and other members of the Movement.

59.     During most of the evening protests in June 2020, the police followed

Plaintiffs and protestors in squad cars and on occasion drove past protestors at high

speeds with their lights flashing.  At times they drove past protestors and then turned

around with their lights facing the protestors as if threatening to run into them.  OCPD

officers laughed at the protestors and recorded them on cameras while taunting the

protestors by saying that they were "dumb" and that they were never going to make

change.  Officers would call out over their intercoms, saying things like "you're in

violation of the law," "go home," "past your bedtime," and "if I see you in the street, I'll

arrest you for jaywalking."

60.     During the month of June 2020, the OCPD began a coordinated effort to

identify members of the Movement and to track their whereabouts.  OCPD instituted this

surveillance simply because of their involvement with the protests.

61.     OCPD officers also used social media to learn more about the protestors.

For example, when Plaintiff Mack joined the Oklahoma City protests immediately after

returning from protesting racist police violence in Minneapolis, several OCPD officers

told Plaintiff Mack that they knew he had been protesting in Minneapolis, saying things

like "we saw you just got back."  Plaintiff Mack had been documenting his presence at

the Minneapolis protests on social media.

62.     Police reports indicate that officers used Facebook to identify individuals

involved in protest activities.

24

63.     The OCPD employed several uniformed officers to film and photograph protesters at protests starting on May 30, 2020.  These officers used high-end, digital single-lens reflex ("DSLR") cameras with microphones attached, and sometimes cell phones, to record protesters.  They focused solely on protesters, not the activities of the police.

64.     Through their efforts, the OCPD targeted the Plaintiffs because of their participation in the protests and took steps to intimidate and harass them.  For example, sometime in June 2020, the OCPD posted the photos and names of members of the Movement, including, at least, Plaintiffs Terry, Mack, and Hogsett, on the walls of police headquarters.

65.     Photos of Plaintiffs and other members of the Movement were also posted on the FOP website.  Plaintiff Hogsett viewed these photos herself several times.

66.     At a protest in mid-June, a Black female uniformed OCPD officer approached Plaintiff Terry and told her that she should be careful because Plaintiff Terry's picture was posted at police headquarters.  The officer quickly walked away.

67.     At a protest in early June 2020, multiple OCPD officers said to Plaintiff Hogsett, "we know who you are; you're the true believers."  Similarly, an OCPD Officer told Plaintiff Webb, "we know who you are."

68.     During the protests, approximately two to three times a week, OCPD officers addressed Plaintiff Terry by name.  At times, Plaintiff Terry asked officers, "how do you know my name?" and one officer responded, "aren't you out here every day?"

During this time, an OCPD officer went to Plaintiff Terry's job at an OnCue convenience store and told her that he knew who she was.

69.    At multiple protests in June 2020, OCPD officers made derogatory comments to Plaintiff Mack, calling him a "shithead" and a "fucker."

70.    In early June 2020, Plaintiff Baker, an independent journalist, started to be recognized by OCPD officers at protests.  One commented to Plaintiff Baker that he knew him as "the person who is filming all the time."  Another officer commented to Plaintiff Baker that he "loved" Plaintiff Baker because he was so "well-behaved."

71.    As part of Plaintiff Baker's independent journalism, he reached out several times to the Mayor of Oklahoma City, David Holt, to request comment on the protests and policing in Oklahoma City.  Plaintiff Baker emailed the Mayor once, and sent at least five direct messages to the Mayor via social media platforms including Facebook, Twitter, and Instagram, but the Mayor never responded.  In mid-June 2020, Mayor Holt's assistant called Plaintiff Baker and asked him to stop contacting the Mayor.  Plaintiff Baker also reached out to the OCPD to request to do a ride-along and an interview with a police officer of their choosing to discuss the protests and policing in Oklahoma City. The OCPD declined this request, citing COVID-19-related safety concerns.

72.    By around June 12, 2020, Plaintiffs and other protestors settled into a daily routine of protesting outside the county courthouse during the day and outside police headquarters and the county jail at night.  Around the courthouse, an individual consistently followed Plaintiffs on foot.  Multiple people, including demonstrators and

attorneys present at these protests, identified this person as a special unit investigator with Defendant Prater's office.

73.     OCPD officers would sometimes follow Plaintiffs after they left a protest. Several times in June 2020, an OCPD patrol car followed Plaintiffs Terry and Baker as they left protests.  Plaintiff Webb similarly saw OCPD patrol cars follow him for seven or eight blocks as soon as he left a protest.

74.     The OCPD persistently followed Plaintiff Mack, including after he left protests as well as when he was on his way to protests, many times throughout June 2020. The OCPD would follow Plaintiff Mack in patrol cars while Plaintiff Mack was both driving and on foot.  Plaintiff Mack became so frustrated and concerned about this routine surveillance that he started to park his car outside of the city center and walk downtown to protest instead.  Even then, the OCPD continued to follow Plaintiff Mack while he was walking from his car.  Plaintiff Mack eventually decided to take taxis or Ubers to and from protests to try to avoid the police.

75.     Starting in early June 2020, a Midwest City, Oklahoma police officer would park across the street from Plaintiff Baker's home several times per week and sit in the patrol car.  Plaintiff Baker had never noticed any police cars parked on his street until he began to go out to protests regularly that June.

**IV.    The Mural Event**

> A.    Plaintiffs and others secure a permit to paint a mural
> outside the OCPD headquarters to celebrate Black lives.

76.    In late June 2020, an individual named Brandon Riles reached out to several Plaintiffs and other members of the Movement soliciting help to plan and paint a mural celebrating Black lives on the street outside OCPD headquarters.  Mr. Riles was not a member of the Movement.  Plaintiffs Baker, Terry, Webb, Nabors and Hogsett took part in planning and painting the mural, which was part of a nationwide effort to paint murals celebrating Black lives near spaces such as courthouses and police stations.

77.    Elizabeth Shilling, an artist with HeartLocke Studio, designed the mural to run the length of Shartel Ave. between W. Main St. and Colcord Dr. abutting police headquarters.  To honor Black Lives and symbolize solidarity, community, and shared struggles, it depicted the Black Liberation Flag, Native American Flag, and the Rainbow Pride Flag.

78.    On or about June 20, 2020, Brandon Riles secured a permit from the City to paint the mural on a stretch of Shartel Ave. abutting the OCPD headquarters.

79.     Before the mural painting started, an Oklahoma City employee set up city

barricades at the location specified by the permit: along Shartel Ave. at West Main St.

and on the south side of the intersection of Shartel Ave. and Colcord Dr.



80.     Racial justice activists started to paint the mural after the city employee set

up the barricades.  Later, on the first day of painting, the City employee returned to

inspect the barricades he had laid out earlier in the day.  Plaintiff Hogsett asked the City

employee whether the mural painters could move the barricades at Shartel Ave. and

Colcord Dr. approximately two to three feet further north on Shartel Ave. because they

were interfering with the top of the mural.  The top of the mural extended into at least

one-third of the intersection of Shartel Ave. and Colcord Dr.  The City employee told

Plaintiff Hogsett that she and others could move the barricades as she described.

81.     Plaintiffs Webb, Terry, Baker, Hogsett, and Nabors all attended the mural painting, though not always at the same time.  Plaintiff Mack never attended the mural painting at any point.

82.     The number of community members present at the mural painting at any given time fluctuated between as few as ten to as many as thirty people.  Some community members would arrive around 9:00 or 10:00 a.m. and remained in the area until around midnight.

83.     The atmosphere during the painting of the mural was generally lighthearted, with children and families present, pizza, music, and dancing.

84.     At any given time during the mural painting, including into the evenings, eight to ten police officers stood at the windows on several floors inside police headquarters, to observe and surveil the mural painters.  Officers took photos and videos of the activity.

85.     The side of the OCPD headquarters facing the mural had large windows. Painters could see OCPD officers and employees watching them from inside the building. Painters witnessed the people inside the building using cellular phones and other devices to take videos and photos of the painters.

86.     In response to this surveillance by the OCPD, some painters, including Plaintiffs Hogsett and Webb, sometimes held up their middle fingers or fists while facing police headquarters to indicate their opposition to these tactics.  Community members also played the protest song, "Fuck tha Police" by N.W.A., over speakers.

87.     During the painting, approximately four or five OCPD officers engaged

with the painters face-to-face.  Several of these officers made snide comments to the

painters.  One officer confronted Plaintiff Webb about his protest activity and political

views and asked, "Who are you gonna call if there is no police?"  The officers made

derogatory comments, such as "fucking protesters."

88.     Throughout the mural painting process, several vehicles attempted to drive

through or around the city barricades on Shartel Ave.  At one point a police officer tried

to drive over the curb at the intersection of Shartel Ave. and Colcord Drive to avoid the

barricades.  The mural painters approached the officer's vehicle and asked the officer to

turn around, which the officer did.

89.     Several non-police motorists also attempted to drive through or around the

barricades during the painting process, and the painters behaved the same in each

instance: several would quickly approach the car to inform the driver that the road was

closed and to turn around or back up, and the driver would comply with no issue.

B.     On June 23, 2020, OCPD Sgt. Wald attempted
       to drive through the mural barricades.

90.     On the afternoon of June 23, 2020, fifteen to twenty people were painting

the mural on Shartel Ave. between Main Street and Colcord Drive.  Plaintiffs Nabors,

Terry, Baker, Hogsett, and Webb were present.

91.     Around 2:30 p.m., Plaintiff Nabors moved the barricades that were inside

the intersection of Shartel Ave. and Colcord Dr.  The barricades clearly signaled that

Colcord Dr. was closed, and impeded passage such that any vehicle attempting to turn

left from Shartel Ave. onto Colcord Dr. would have to drive over the curb to avoid the

barricades.  But because several vehicles had ignored these barricades and driven over the

curb at the northeast corner of Shartel Ave. and Colcord Dr., Plaintiff Nabors decided to

move two of the barricades closer to this corner to stop more vehicles from passing

through the mural painting area.  Plaintiff Nabors believed that the location to which he

moved the barricades was within the legal bounds of the permit that was obtained to paint

the mural.

92.    Approximately ten minutes later, at 2:41 p.m. according to later police

reports, Plaintiffs Nabors and Webb walked to Nabors' vehicle.  The vehicle was parked

across Shartel Ave. from the police headquarters on the W. Main Street side.  Plaintiff

Nabors took his camo-painted AR-22 rifle from the back seat of his vehicle and showed

the rifle to Plaintiff Webb, who was interested in seeing the rifle to compare it to one that

Plaintiff Webb owned at home.  Shortly after, Plaintiff Nabors returned the rifle to the

back seat of his car.  Plaintiff Nabors never raised the gun above his chest and never

pointed or aimed it at any individual or at the police headquarters.

93.    Unbeknownst to Plaintiff Nabors, Defendant VanNort observed this

exchange, whereupon he had an analyst "run a tag" on the vehicle.

94.    Approximately 45 minutes later, at around 3:15 p.m., Sgt. Wald of the

OCPD was driving his police cruiser and encountered the city barricades at the north end

of the mural painting area at the intersection at Shartel Ave. and Colcord Dr.

95.    Wald attempted to turn left onto Colcord Dr. from Shartel Ave., but the city

barricades blocked his passage.  Wald stopped his car and stepped out onto the street,

proceeding to pick up one of the city barricades at the northeast corner of the intersection and move it west, which would allow him to turn onto Colcord Dr.

96.     Plaintiff Baker was filming north of the mural on Shartel Ave. when he observed Sgt. Wald moving the barricade and ran to Sgt. Wald's vehicle.  Plaintiff Baker told Sgt. Wald that the road was closed.  At about the same time, Plaintiff Nabors walked up to Sgt. Wald's vehicle from the south reiterating that the road was blocked off and asked Sgt. Wald if he thought he could move the barricades just because he was a police officer.

97.     Sgt. Wald got back into his vehicle and started to drive forward, but Plaintiff Baker stood in front of Sgt. Wald's vehicle to stop him from passing into the barricaded area, while Plaintiff Nabors stood to the side of the vehicle.  Sgt. Wald stopped his vehicle and immediately opened his door and stepped into the street, threatening Plaintiffs Nabors and Baker, saying "move out of the way or you go to jail."

98.     Sgt. Wald stated that he was transporting a witness to a "black on black crime" and "I'm trying to help these people."  Plaintiffs Nabors and Baker responded that the group had permits allowing them to block off the road.  Plaintiff Nabors also said that Sgt. Wald could have easily gone around to police headquarters another way.  Plaintiff Baker continued to film the encounter but did not make any additional comments to Sgt. Wald after this point.

99.     Plaintiffs Terry, Hogsett, and Webb approached the scene and joined Nabors and Baker standing in front of Sgt. Wald's vehicle.  Plaintiff Hogsett began to film the encounter on her phone.

33

100.     Seconds later, Sgt. Wald got back into his vehicle.  Plaintiff Nabors stated that Sgt. Wald's actions were "a perfect example of a cop abusing his fucking power" and said that Sgt. Wald should "just go the other way."  Sgt. Wald proceeded to drive forward and came within inches of hitting Plaintiff Terry.  Plaintiff Terry did not move and said "hit me if you want to."

101.     Plaintiffs Terry and Hogsett yelled, "Fuck the police!", "We have a permit!", and "This is a city ordinance!"  Someone standing next to the driver's side of Sgt. Wald's vehicle called out Sgt. Wald's badge number.  Plaintiff Webb moved to the driver's side of the vehicle and asked Sgt. Wald to "just back up" and "just go around the block."

102.     At this point, Brandon Riles, who held the permit for the mural painting event, approached Sgt. Wald at his window to show him the permit.  Riles proceeded to explain why the intersection was blocked off while Sgt. Wald reviewed a copy of the permit on Riles' phone.

103.     After a brief discussion between Sgt. Wald and Brandon Riles, Sgt. Wald began to back up his vehicle, and Riles thanked him.  Plaintiff Hogsett yelled "now who got a mother fucking barricade!"  Plaintiff Webb stated, "I don't know what made you think you could come through a barricade, man."

104.     Plaintiffs Webb, Hogsett, Baker, and Terry briefly walked after the vehicle as it backed away and did not impede its movement.  Plaintiffs Hogsett and Webb held their fists over their heads.  Since the 1960s, the raised fist has been an emblem of the racial justice movement signifying power, pride, perseverance, and solidarity.

105.    As Sgt. Wald pulled away, Plaintiff Nabors returned the barricade that Sgt. Wald had moved to the northeast corner of Shartel Ave. and Colcord Dr.

106.    As soon as Sgt. Wald turned around and drove away up Shartel Ave., Plaintiffs stopped following Wald's vehicle.

107.    Plaintiff Baker filmed the entire encounter with a three-foot extender for his publication *The Black Times.*

108.    Throughout this encounter, there were, at most, seven individuals standing within a few feet of Sgt. Wald's vehicle.  These individuals only ever stood in front of or to the side of the vehicle, not in back of the vehicle.  At no point was Sgt. Wald's vehicle surrounded by people or prevented from moving in reverse.

109.    A small number of painters stood nearby to watch the encounter.  They stood approximately fifteen to twenty feet away from Sgt. Wald's vehicle, simply observing and filming, or calling out Sgt. Wald's badge number.

110.    Most of the mural painters present at the time continued to paint peacefully while this encounter took place.  Once Sgt. Wald pulled away, Plaintiffs Nabors, Webb, Baker, Terry, and Hogsett returned to painting the mural.

111.    At no point did Plaintiffs Webb, Hogsett, Nabors, Terry, or Baker call any other painters to come over to Sgt. Wald's vehicle.

112.    At no point did Plaintiffs Webb, Hogsett, Nabors, Terry, or Baker threaten Sgt. Wald or anyone else.

113.    At no point did Plaintiffs Webb, Hogsett, Nabors, Terry, or Baker encourage anyone to engage in violence.

35

114.    At no point did Plaintiffs Webb, Hogsett, Nabors, Terry, or Baker harm or destroy any type of property, or make any threats to do the same.

115.    At no point did Plaintiffs Webb, Hogsett, Nabors, Terry or Baker encourage any other individuals present to harm or destroy any type of property.

116.    Sometime after this encounter with Sgt. Wald, on the same day, an officer from inside OCPD headquarters approached the mural painters and told Plaintiff Terry that she and others were welcome to come to police headquarters the following day to file a complaint about Sgt. Wald and his conduct, and to show any video footage of the encounter.

**V.      Plaintiffs attempt to complain about Sgt. Wald's conduct to the OCPD and get arrested for disorderly conduct.**

     **A.      OCPD arrests Plaintiffs for attempting to complain about Sgt. Wald's conduct.**

117.    On the morning of June 24, Plaintiffs Terry, Baker, Hogsett, and a fellow activist with the Movement ("MM"), went to the Mayor's office to complain about OCPD Sgt. Wald's misconduct during their peaceful mural protest.  They called his office from outside the building and spoke with his secretary, who stated the Mayor was unable to meet with them.

118.    Shortly thereafter on the same morning, at around 10:00 a.m. on June 24, Plaintiffs Terry, Baker, Hogsett and MM returned to the OCPD headquarters to file a complaint against Sgt. Wald for attempting to pass through the mural barricades and nearly hitting Plaintiff Terry.

119.    At OCPD headquarters, Plaintiffs entered the vestibule, but found the front doors locked.

120.    Plaintiff Baker began filming their attempt to lodge a complaint and continued to film throughout the encounter on his phone and on Facebook Live.

121.    Plaintiff Hogsett pressed a button that buzzed inside the building, and an officer appeared at the door and asked why they were there.  Plaintiffs Hogsett and Terry explained that they were there to file a complaint against Sgt. Wald, and that they had been invited to come to police headquarters to do so by a different officer the day before.

122.    A different OCPD officer began recording Plaintiffs in the vestibule with a body camera and continued filming them for the entire time they were there.

123.    The officer at the door refused to let them in or take a complaint against Sgt. Wald.  The officer said that they should call 911 to make a complaint and that they were not allowed in the building because of COVID-19-related safety procedures.  She then closed the door and walked away.

124.    Despite this statement, OCPD officers let multiple other people into headquarters throughout the day.

125.    Plaintiffs Hogsett, Terry, and Baker, and MM called 911.  The 911 operator would not take a complaint from people who were already at police headquarters and instructed them to file their complaint at police headquarters in person.

126.    Plaintiff Hogsett again pressed the button to signal someone inside the building.  The same officer returned, and Plaintiff Hogsett explained that the 911 operator directed them to file their complaint about Sgt. Wald at police headquarters instead.

Despite this, the officer still refused to allow them inside to file a complaint. This back and forth continued several times, with the officer always refusing to grant Plaintiffs access to the building.

127.    While this was happening, Plaintiffs observed the same officer grant other members of the public access to OCPD headquarters without issue, including two women, a man, and a UPS delivery person, all of whom were White. One or more of the three Plaintiffs asked these individuals if they had appointments, and each of them said they did not. The Plaintiffs attempted to follow these civilians inside the building when the doors were opened for them, but the officer would close the door behind them and continue to refuse access.

128.    A Spanish-speaking man also entered the vestibule and sought entry, but the officer could not understand him. The three Plaintiffs told the officer that the man needed a translator, but the officer refused to provide one.

129.    The three Plaintiffs continued to wait in the vestibule, trying to gain access to headquarters. At no point did Plaintiffs block anyone from going in or out of the building.

130.    After approximately forty minutes, Plaintiffs Hogsett, Terry, and MM became increasingly frustrated that the officer continued to turn them away and demanded that they be allowed into the building to file a complaint against Sgt. Wald. Around this point, the officer opened the door to the vestibule from inside the building, continuing to refuse access to Plaintiffs and MM, and spoke directly to MM. Plaintiff Hogsett began to film the encounter on her phone. MM asked the officer, "Why are you

walking up on me?". The officer did not say anything in response but instead attempted to close the door to the building while MM was standing in the doorway. Upset, MM stated, "you're not gonna do that" and "you're not gonna touch me," and Plaintiff Hogsett walked over to the door.

131.    At this point, a man in a black polo shirt came from inside the building and blocked the doorway. Plaintiff Hogsett repeated multiple times that they were there to file a report concerning an officer. Several uniformed officers then began to appear at the doorway. While addressing the man in the black polo shirt, MM pointed her finger at him. He then grabbed her wrist and pushed it down. Plaintiff Hogsett stated "do not touch her" and the man proceeded to push MM backwards. Plaintiff Terry stood to the side and filmed the encounter on her phone while Plaintiff Hogsett continued to film as well.

132.    A male, uniformed officer proceeded to enter the vestibule through another doorway and spoke to Plaintiff Hogsett. Plaintiff Hogsett explained that the other officers had been rude to them and that they were trying to file a complaint against Sgt. Wald, stating that they would "calm down" if they could have an opportunity to make their complaint.

133.    MM continued to speak to other officers in the doorway, stating "we're not being violent or anything, we're asking to talk." Seconds later, two uniformed officers stepped into the vestibule and arrested MM. Plaintiff Terry asked, "why are you arresting her?" and Plaintiff Hogsett demanded the names and badge numbers of the officers, loudly stating that the officers needed to send someone to take their complaints.

134.    In frustration, Plaintiff Hogsett exclaimed shortly after MM was arrested that she would "burn this place to the ground," though she did not have any means or intent to do so.  She did not have a lighter, lighter fluid, gasoline, or any other apparent means to act on her statement.  She was wearing a dress without pockets and could be clearly observed to not have any means to start a fire.  Her statement was political hyperbole made in frustration.  Plaintiff Baker told her not to make such statements.

135.    Plaintiff Terry became concerned about what the police would do after Plaintiff Hogsett made this comment and attempted to leave the vestibule.  However, another uniformed officer grabbed Plaintiff Terry by the arm and refused to let her leave. Moments later, the officer pulled Plaintiff Terry into the building by the wrists and arrested her.

136.    As the officer arrested Plaintiff Terry, multiple other officers stood on the upper floors of the building looking down through the atrium and into the lobby and started applauding.

137.    Seconds later, other officers invited Plaintiffs Hogsett and Baker inside the building and told them that they wanted to talk.  Both Plaintiffs Hogsett and Baker continued to film the encounter.  The officers walked them into the lobby and into an area with several benches, where officers asked Plaintiffs Hogsett and Baker to wait.

138.    As they walked into the building, one of the OCPD officers told Plaintiffs Hogsett and Baker "we know who you are" and "we've seen your pictures and videos." Plaintiffs Hogsett and Baker understood this to be a reference to police surveillance photos and videos taken during the protests.  One of the officers asked Plaintiff Baker if

he was "the kid that's always recording."  Police seized his phone.  When Plaintiff Baker later received his phone back from OCPD, all video of this incident had been deleted.

139.    After a few minutes, several officers approached Plaintiffs Hogsett and Baker, arrested them, and handcuffed them behind their backs.

140.    Plaintiffs Baker, Terry, and Hogsett were loaded into police vans and held there for approximately an hour and a half before being transported across the street to the Oklahoma County Jail.

141.    Hogsett spent fifteen hours in jail before being released on a $5,000 bond in the early morning hours of June 25, 2020.

142.    Baker and Terry spent ten hours in jail before being released on their own recognizance on June 24, 2020.  They were never brought before a judge and any charges against them were dropped.

>    B.    The probable cause affidavits justifying the disorderly conduct
>          arrests contain misrepresentations and material omissions.

143.    Following these arrests, an OCPD officer submitted probable cause affidavits to the Oklahoma County District Court to justify the arrests of Plaintiffs Baker, Terry, and Hogsett.

144.    The OCPD knew that Plaintiffs were engaged in protected First Amendment activity.  The probable cause affidavits identify Plaintiffs as "members of a protest group who identify themselves as 'The Movement'" and state that Plaintiffs had come to "make a Police report in reference to an Officer trying to run over one of them the previous day while they were painting on Shartel Ave. near Police headquarters."

The affidavits highlight that a "black male," presumably Plaintiff Baker, and Plaintiff Hogsett were filming the encounter and Plaintiff Hogsett was "streaming the video live on social media."

145.    The probable cause affidavits contain numerous misrepresentations and material omissions.  For example, the affidavits:

a.    do not identify Plaintiff Baker by name, and instead refer to him by his race and First Amendment activity as a "black male filming with a cell phone on a selfie type stick";

b.    do not include specific factual allegations against Plaintiff Terry;

c.    fail to state that when Plaintiffs attempted to make a telephone complaint as instructed, the operator refused to take their complaint because they were calling from police headquarters;

d.    accuse Plaintiffs of blocking service to a Hispanic male, unrelated to the group, who wished to enter the building, but failed to state that the police denied access to this man, a monolingual Spanish speaker, because they could not understand why he wished to access the building, and Plaintiffs were requesting that OCPD provide him an interpreter so that he could explain his business;

e.    fail to state that OCPD officers allowed multiple members of the public into the building while denying entry to Plaintiffs Terry, Baker, and Hogsett;

f.    fail to state that while Plaintiffs stood in front of one set of double doors, members of the public freely walked in and out of another set of double doors when granted access by OCPD and instead misrepresent that the Plaintiffs "blocked citizen access" to the vestibule; and

g.    fail to state that Plaintiff Hogsett was the only person who made any alleged threats, and instead misrepresented that "the remainder of the group continued to agitate and escalate their rhetoric," which was not true.

146.    At no point did any of the Plaintiffs block the entrance or exit of the building.

147.    At no point did Plaintiffs Baker or Terry say anything violent or allude to the potential for violence.

148.    To the contrary, the OCPD officer imputed the statement of Plaintiff Hogsett, who is white, to Plaintiffs Baker and Terry, who are Black, by falsely accusing them of engaging in "increasingly violent rhetoric."

149.    On June 25, 2020, based on these allegations, misrepresentations and omissions, a district court judge determined that probable cause existed at the time of Plaintiffs' arrests.

## VI.    Defendants Prater, VanNort, and the City conspire to retaliate against Plaintiffs for their exercise of First Amendment Rights.

### A.    Defendants Prater and VanNort decide to charge Plaintiffs with felony incitement to riot in connection with the mural painting.

150.    Rather than taking and investigating Plaintiffs' complaint about Sgt. Wald's conduct, Defendants Prater and VanNort conspired to make an example of them.  Prater and VanNort planned to punish the racial justice activists by foregoing the misdemeanor disorderly conduct charges based on Plaintiffs' activity at the police station in favor of more severe, unjustified, felony incitement to riot charges arising out of the encounter with Wald at the mural painting on June 23.  Oklahoma City, through its final policymaker Chief Gourley, approved and ratified this plan.

151.    Consistent with this plan, Defendants did no work to pursue the disorderly conduct charges against Plaintiffs Baker, Terry, and Hogsett.  The state formally declined to prosecute the charges on July 27, 2020.

152.    Immediately after the June 24 arrests, instead of investigating Sgt. Wald's conduct, OCPD launched an investigation against Plaintiffs.  Defendant VanNort conducted the investigation and multiple OCPD officers participated.

153.    Only after Plaintiffs' attempt to file a complaint and subsequent disorderly conduct arrests did OCPD officers prepare police statements about the Wald encounter. These reports contain an inordinate focus on Plaintiffs' First Amendment activities and criticism of police and the OCPD.

154.    For example, on June 24, 2020, OCPD officer Jeremy Harrison prepared a report concerning Plaintiffs' conduct on "the day prior," June 23.

155.    Officer Harrison did not witness the Wald encounter, nor does his report describe the Wald encounter.

156.    Harrison's report focused largely on documenting the protestors' speech earlier on June 23, which was critical of him and others.  Officer Harrison reported that the Plaintiffs made "vulgar and rude" comments to him.  He stated that Plaintiffs Terry and Hogsett "yelled at me several times and were among the most vocal," while Plaintiff Baker was not as loud but was "continuously making rude comments" to him.  He stated that several citizens told him "in line with fuck the police, you keep killing us and leaving us on the street, and other similar statements." He described the protestors as "cursing at him," "berating" him, asking how the police department could block the street for two

44

weeks, but give them a hard time for blocking it for a few days.  He stated that protestors called him "bald" and told him to "get a real job like Jimmy Johns because everybody likes sandwiches."  In a supplemental report, Officer Harrison also stated that someone referred to as "Trevor" told him that "nothing I could tell anyone would matter and that was nobody was going to listen to me."

157.    Similarly, Defendant VanNort prepared an Investigative Report on June 26 demonstrating that he had carefully reviewed Plaintiffs' social media presence, including their First Amendment activity.  Defendant VanNort noted that Plaintiff Baker founded the Black Times Media Company and appeared in a video that called for defunding the police and that Plaintiffs Terry and Mack had shared a photograph of them raising their fists while standing in front of a red, black, and green flag, also known as the Black Liberation Flag.

158.    On June 24, 2020, after the arrests of Plaintiffs Baker, Terry, and Hogsett at police headquarters, Sgt. Wald completed a report about the June 23 mural encounter. Sgt. Wald described how, as he attempted to drive past the barricade, "a cameraman"— Plaintiff Baker—"stopped me by standing in front of my car, refusing to move, and blocking my access to headquarters."  Wald "told him to move or I would take him to jail."

159.    Sgt. Wald's report goes on to describe how Plaintiffs Terry and Hogsett blocked his movement by standing in front of his car.  According to Sgt. Wald, they yelled "Fuck you, fuck the police," and Plaintiff Terry yelled "hit me" several times. During this time "several other people" walked to his car and "stood all around the front."

According to Wald's report, Brandon Riles then walked to the driver's side window and said that they had a permit to close the streets and showed Sgt. Wald the permit on his phone, after which Sgt. Wald "started to back up to drive around the block." He noted that the "protestors followed me as I was backing" and "were yelling and cussing."

160.    Sgt. Wald did not report that his car was surrounded.

161.    Sgt. Wald did not report that he could not move his vehicle in reverse, nor did he mention the presence of protestors in back of his vehicle.

162.    Sgt. Wald did not report hearing any person urging any other person to use force or commit an act of violence.

163.    On June 24, 2020, after the arrests of Plaintiffs Baker, Terry, and Hogsett at police headquarters, OCPD Officer Eric Long also submitted a report regarding his observation of the Wald encounter. Officer Long's report is consistent with that of Sgt. Wald.

164.    Officer Long observed the events from his office at Police Headquarters. He described how "7-8 males and specifically (2) females" were "standing in front of the patrol car and from their animated actions were extremely angry," noting that "everyone had a cell phone out recording the incident."

165.    Officer Long's report specifically states that Sgt. Wald was "blocked by the people standing in front of his patrol car" but that he was able to "place the patrol car in reverse" and "back up." Officer Long did not report that Sgt. Wald's car was surrounded, nor did he describe protestors standing in back of the vehicle. Rather, Officer Long

observed that "as he [Sgt. Wald] started to back up the small crowd followed the officer holding their cell phones up recording and yelling at the officer."

166.    On June 25, 2020, Defendant VanNort presented the case to Defendant Prater.

167.    Defendant Prater determined to charge Plaintiffs with incitement to riot, a felony.

168.    Defendants Prater and VanNort conferred about the decision to bring felony charges.

169.    The purpose of bringing felony charges was to punish Plaintiffs for exercising their First Amendment rights, for their anti-police and OCPD views and statements in particular, and to deter others from engaging in racial justice protest activity.

170.    The charges were a joint attempt by the OCPD and DA Prater to stifle free speech by over-charging individuals with felony incitement to riot conduct and by implicitly threatening that Oklahomans can face serious felony charges simply for speaking critically of an officer, the OCPD, police violence, painting a mural, and being present during a protest.  The fact that most of these charges were leveraged against young Black men and women is part of the very problem the community had been protesting.

171.    Defendant Prater later said to Plaintiff Webb that he was "angry" and "pissed off" at the things that the protestors were saying to Sgt. Wald.

172.    On June 27, 2020, *The Oklahoman* reported that: "Oklahoma County District Attorney David Prater made the decisions himself on the charges in a get-tough approach meant to deter others from going too far during protests in the future."  Prater stated, "This is not Seattle . . . . We're not putting up with this lawlessness here."

173.    Later, on or around July 11, 2020, Defendant Prater stated, referring to the protestors: "These criminals have subverted peaceful protests and impaired the open discussion regarding race in our country . . . .  When you act like a terrorist, you will be treated like a terrorist."  He accused protestors of using what he called "propaganda to disrupt societal and communal relationships . . .", comments that express his own personal bias against protestors' political and social viewpoints.

174.    OCPD Chief Wade Gourley ratified the decision of Defendants Prater and VanNort to pursue felony charges against Plaintiffs.  At an August 11 virtual town hall hosted by Oklahoma Justice Circle, Chief Gourley was asked: "What are the thoughts of the OCPD Police Chief Gourley about DA David Prater pressing charges against activists and journalists in Oklahoma County?  Do you feel that he is upholding the Constitution and rights you're supposed to protect?"  Chief Gourley responded, "while I can't expressly get into all the facts and details as to why OK D.A. David Prater filed charges, there were events that occurred that I feel like justice needs to be served."

175.    Only after Defendants Prater and VanNort conferred about the felony charges did Defendant VanNort prepare an Incident Report about the mural encounter.

176.    Defendant VanNort's Incident Report is dated June 26, 2020.

48

177. In his June 26 report, VanNort states, for the first time in any report about the mural encounter, that for a brief time Wald's "vehicle was completely confined from moving in any direction," that Plaintiffs Baker and Nabors "escalated the situation by calling others," and that Plaintiff Terry was engaged in "a stunt meant to get the crowd worked up." This language is identical to the language VanNort used in the Affidavits and Applications for Arrest Warrant for each of the Plaintiffs (the "Affidavits," and each an "Affidavit").

178. The Affidavits are also dated June 26, 2020.

B. DA Prater and the OCPD obtained unreasonable arrest warrants predicated on clear misrepresentations and omissions.

179. On June 26, 2020, Defendant VanNort signed and swore to the Affidavit and Application for Arrest Warrant and the Arrest Warrants for Plaintiffs Nabors, Baker, Hogsett, Terry, and Mack. Each of the Affidavits is identical. Every Affidavit included allegations about Plaintiff Mack, who was not present at the mural painting at all.

180. On June 29, Defendant VanNort signed and swore to an amended Affidavit and Application for Arrest Warrant and the Arrest Warrants. The amended Affidavits are identical to the original Affidavits, except that Austin Mack is replaced by Trevour Webb in the caption and body of the Affidavit.

181. Certain statements made in the Affidavits strongly suggest that Defendants Prater and VanNort conferred about what to include in the affidavit to justify the incitement charges.

182.    Specifically, the Affidavits state that some Plaintiffs sought to "incite action by others" and "get the crowd worked up," "ramped up," or "excited."

183.    However, the incident reports prepared by Sgt. Wald and Officer Long at the time do not include this information.

184.    These statements appear to have been inserted into the narrative after the decision to bring felony charges in an attempt to meet the statutory definition of the crime.

185.    As described further below, these details were false and fabricated in order to procure unjustified warrants.

186.    Moreover, as described further below, even if taken as true, these statements do not provide probable cause for a charge of incitement to riot.

### 1.    Elements of an Incitement to Riot charge

187.    Under Oklahoma law, it is "unlawful and shall constitute incitement to riot for a person or persons, intending to cause, aid, or abet the institution or maintenance of a riot, to do an act or engage in conduct that urges other persons to commit acts of unlawful force or violence, or the unlawful burning or destroying of property, or the unlawful interference with a police officer . . . officially assigned to riot duty in the lawful performance of his duty."  21 Okl. St. Ann. § 1320.2.

188.    In each of the Affidavits, VanNort admitted that "[t]here were no police employees assigned to protest/riot related duties since the painters were not causing problems."

189.    Accordingly, to support an incitement to riot charge, the affidavit needed to set forth facts showing that the Plaintiffs (i) acted with the intent to cause the initiation of a riot by (ii) urging others to commit acts of unlawful force, violence, or destruction of property.[5]

190.    Furthermore, the Oklahoma Supreme Court has long held that when a person is engaged in First Amendment expression, they cannot be charged with incitement to riot unless their speech rises to the level of a "clear and present danger." *Price v. State*, 873 P.2d 1049 (1994).

### 2.    *The Affidavits Failed to Establish Probable Cause*

191.    Taking the statements in the Affidavits as true, the Affidavits failed to set forth facts showing probable cause to believe that any Plaintiff committed incitement to riot.

<u>*Plaintiffs Nabors and Baker*</u>

192.    The Affidavit contains the following allegations against Plaintiffs Nabors and Baker:

    a.    At 2:30 p.m., and again at 2:35 p.m., Plaintiff Nabors moved the barricades.

    b.    At 2:41 p.m., Plaintiff Nabors retrieved an AR-15 style rifle from his vehicle, held it in the air, and then returned it to the back seat of his vehicle.

---

[5] The Oklahoma Riot Statute, 21 Okla. Stat. § 1311 defines "riot" to mean "[a]ny use of force or violence, or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law."

c.    After Sgt. Wald arrived and attempted to drive through the barricades, Plaintiffs Nabors and Baker "stood in the roadway to stop Sgt. Wald's vehicle from proceeding."

d.    Plaintiff Baker "held up a camera, filming this part of the incident."

e.    Plaintiffs Baker and Nabors "escalated the situation by calling others."

f.    Plaintiffs Baker and Nabors "appeared to be holding objects up as if filming the encounter."

g.    Plaintiff Nabors "moved back in front of the vehicle" and may have been "yelling and pointing at the vehicle."

193.    Plaintiff Nabors' alleged actions of moving the barricades and briefly holding a rifle in the air occurred prior to Sgt. Wald's arrival and therefore are not relevant.

194.    Standing in the roadway to block a vehicle's passage does not signal intent to start a riot, nor does it involve urging others to do so.

195.    Filming the encounter is protected First Amendment activity.  It does not signal intent to start a riot, nor does it involve urging others to do so.

196.    The Affidavits fail to cite any specific words uttered by either Plaintiff.  A court could not reasonably determine from the vague allegation that Plaintiffs "escalated the situation by calling others" that their words created a "clear and present danger" of violence.  Merely calling others is not the same as urging them to commit acts of violence.

197.    Similarly, Plaintiff Nabors' alleged "yelling and pointing at the vehicle," while perhaps distasteful to the officer involved, does not signal an intent to engage in

violence, does not urge others to commit acts of unlawful force or violence, and does not pass the "clear and present danger" test.

198.    The Affidavits contain no other allegations relevant to Plaintiffs Baker and Nabors.

*Plaintiffs Mack and Webb*

199.    The allegations against Plaintiffs Mack and Webb are identical, except that the allegations pertained only to Plaintiff Mack in the original Affidavit and only to Plaintiff Webb in the Amended Affidavit.

200.    The only allegations against Plaintiffs Mack and Webb are that they joined the other Plaintiffs "in front of the vehicle" with "fist raised, as he had been seen doing earlier in the day" and that they pursued the vehicle after it was backing away, screaming "Fuck the Police!"

201.    These alleged words and actions do not signal an intent to commit violence.

202.    These alleged words and actions were directed at the officer and not at other protestors and do not pass the "clear and present danger" test.

203.    The Affidavits fail to allege that these Plaintiffs urged anyone to commit violence or to use force.

204.    The Affidavits contain no other allegations relevant to Plaintiffs Mack and Webb.

*Plaintiffs Terry and Hogsett*

205.    The Affidavit contains the following allegations against Plaintiffs Terry and Hogsett:

     a.     Plaintiffs Terry and Hogsett "blocked the vehicle with Terry screaming that the officer hit her to incite action by others";

     b.     Plaintiff Terry screamed "Fuck the Police!" and taunted the officer to hit her, which "appeared to be a stunt meant to get the crowd worked up";

     c.     Plaintiff Terry "was seen on camera waving her hands";

     d.     Plaintiffs Terry and Hogsett "were getting the crowd worked up for an encounter with Wald";

     e.     Plaintiff Terry "was getting the crowd excited as if TERRY was trying to incite an incident between Wald and the group"; and

     f.     Plaintiffs Terry, Webb, and Hogsett pursued the vehicle screaming "Fuck the Police!"

206.    The Affidavit contains no report of words actually uttered, nor of any actions by Plaintiffs Terry and Hogsett that would urge another person to violence.

207.    The Affidavit alleges that Plaintiffs Terry and Hogsett directed their words at the officer, not at other protestors.

208.    The Affidavit itself acknowledges that Plaintiffs' words and actions had little impact outside the small group gathered around Sgt. Wald's vehicle, or that the crowd was "excited."  On the contrary, the Affidavit states that throughout the incident, the "remainder of the peaceful protesters . . . continued their peaceful painting."

### 3. *The Affidavits contain knowing and/or reckless misrepresentations and omissions.*

209.    In addition to failing to provide probable cause on their face, the Affidavits contain a number of material misrepresentations and omissions.

210.    First, Plaintiff Mack was not present at the mural painting on June 23, 2020.  All the allegations against Plaintiff Mack are false.

211.    Second, the witness statements and investigative reports do not describe anything like a riot, but the Affidavits refer to Plaintiffs as "the rioters." This is a gross contrivance.  None of the Plaintiffs used force or violence during the encounter with Sgt. Wald.

212.    Third, Plaintiff Nabors did not hold up his AR-22 rifle in the air.  He took it out of the back seat of his car to show it to Plaintiff Webb, who wanted to compare it to his own rifle that he had at home, and after a few seconds returned it to his car.  Even that exchange took place well before Sgt. Wald arrived on the scene.

213.    Fourth, video evidence clearly shows that:

    a.    Plaintiffs Baker and Nabors never called others to join the scene. The allegation that these Plaintiffs "escalated the situation by calling others" is false.

    b.    Sgt. Wald's vehicle was never surrounded or prevented from moving backwards.  Sgt. Wald and Officer Harrison's incident reports concur that Sgt. Wald had no problem backing his car away.  Neither Sgt. Wald nor Officer Harrison reported observing protestors behind or surrounding the vehicle.  To the contrary, both officers described a small group of protestors standing in front of the vehicle.  The allegation that "Wald's vehicle was completely confined from moving in any direction, including backwards" is false.

    c.    While some people gathered to watch the encounter, they stood at a distance recording the incident on their phones.  They did not begin to riot and in no way blocked Sgt. Wald's movement.

    d.    Throughout the encounter with Sgt. Wald, the Plaintiffs spoke only to him, not to others in the crowd.

e.   Throughout the encounter with Sgt. Wald, Plaintiffs told him to back up and go around the block to police headquarters instead of through the barricaded area.  This other route to police headquarters was available to Sgt. Wald at all times, and at the end of the encounter, he successfully used it to transport his witness to headquarters.

214.   Defendants Prater's get-tough and negative approach towards protesters, combined with VanNort and Prater conferring about what to include in the affidavit to justify the incitement charges and the irregular timing of his police report and Affidavits, as discussed above, strongly indicate that VanNort knowingly fabricated allegations of probable cause with the abovementioned misrepresentations and omissions.

215.   Without the false statements and including the omissions, the affidavit does not establish probable cause that plaintiffs acted in such a way as to urge others to commit acts of unlawful force or violence.  None of the Plaintiffs' statements constitute fighting words and are all protected speech.  All that remains are protesters standing in front of an officer's car and yelling, which cannot create probable cause for the elements of an incitement to riot charge.  To the contrary, the Affidavits and police reports contain ample evidence that Defendants targeted Plaintiffs for their speech critical of the OCPD and police, which the OCPD and Prater disfavored.

C.   DA Prater and the OCPD worked together to charge other protestors with felonies arising out of protected First Amendment activity.

216.   Defendants' retaliatory action toward Plaintiffs was part of a larger pattern of arresting and charging social justice activists with unreasonably serious crimes to deter speech critical of police.

217.    On June 26, 2020, the OCPD and Prater worked together to bring terrorism, rioting, and other felony charges against nine other racial justice protestors, including persons who had videotaped the protests and some who had already been arrested on May 30 and 31, due to their ongoing protesting.

218.    Over the next month, OCPD and Prater worked together to bring criminal terrorism and obstruction charges against eleven additional racial justice protestors critical of the OCPD.

219.    The charges lodged against Plaintiffs and others, and excessive bonds demanded, caused widespread public concern and opprobrium.  The bonds far exceeded the bond schedule.

220.    Bonds for individuals arrested in connection with racial justice protests were set by the court at DA Prater's request in unprecedented, punitive amounts, far exceeding the applicable bond schedule, ranging from $200,000 to $1,000,000 individually-the total exceeding $4,000,000.

221.    Prosecutors dropped terrorism charges against two of the protestors who had been charged, Haley Lin Crawford and Sydney Lynch, after realizing they were only seventeen years old at the time.

### VII.    Each Plaintiff was subjected to continued retaliatory action by the OCPD as a result of engaging in protected First Amendment activity.

A.    Plaintiffs learn of the incitement charges while protesting police violence; news of the charges spreads and ends the protest.

222.    On June 26, 2020, Plaintiffs Terry, Baker, Nabors, Hogsett, Mack, and Webb attended a protest in memory of Isaiah Lewis, a Black 17-year-old who was shot

and killed by the Edmond, OK police in 2019. The protest began around 6:00 p.m. and took place outside the Edmond police department. Approximately 50 people participated in the protest.

223.    All Plaintiffs protested in the middle of the intersection, helping to ensure vehicles did not drive through and leading chants like, "Black lives matter," "Hands up, don't shoot," and "Say their names." Plaintiffs Terry, Nabors, and Mack spoke over a megaphone to lead chants. Plaintiff Mack led the singing of an old spiritual, "Ain't Gonna Let Nobody Turn Me Around." Plaintiff Hogsett left to get pizza for the protesters. Plaintiff Baker was documenting the protest and interviewing protesters with the intention of making a documentary.

224.    Around 7:00 p.m., while at the protest in Edmond, Plaintiff Nabors received a call from an activist and organizer formerly affiliated with BLM OKC, who told Nabors about a news report that Plaintiffs Terry, Baker, Nabors, Hogsett, and Mack had been charged with incitement to riot under state law. Around the same time, Plaintiff Mack received a similar call. Plaintiff Mack then informed Plaintiff Terry of their charges.

225.    Plaintiffs Nabors, Mack, and Terry shared this information with Plaintiffs Baker and Webb. At the time, Plaintiff Hogsett was a few blocks away picking up pizza for the group.

226.    News of the charges also began to spread to the other protesters present. Concern and panic fell over much of the crowd.

227.    Plaintiffs Terry, Mack, Nabors, and Baker left the protest, terrified of an arrest and uncertain how to protect their safety.  The crowd dispersed.

228.    Plaintiff Webb waited at the waning protest for Plaintiff Hogsett to return.

229.    When Plaintiff Hogsett returned to the protest area with pizza, the crowd of protesters was gone.  Plaintiff Hogsett found Plaintiff Webb, who told her about the charges against her.  Plaintiffs Hogsett and Webb sat together, shocked and scared, for a few moments before each also leaving the area.

230.    The Movement's protests in front of OCPD Headquarters, which had occurred every night for nearly a month ended abruptly after Defendants brought Incitement to Riot charges against the Plaintiffs.

B.    Defendants obtain arrest warrants and
    unreasonably high bonds against Plaintiffs.

231.    On June 26, 2020, Defendant Prater sought and obtained arrest warrants for the felony incitement to riot charges against Plaintiffs Terry, Baker, Hogsett, Nabors and Mack based upon the Affidavits of Probable Cause signed and sworn to by Defendant VanNort on that same date.

232.    At Defendant Prater's request, the court set bail for each of the Plaintiffs in amounts grossly exceeding the normal amount that would be set for the offense.

233.    Pursuant to 22 Okl. St. Ann. § 1105.2, the District Court of Oklahoma County established an Amended Jail Bail Schedule (the "Bail Schedule") on July 31, 2019, to "be utilized by the Jail following a person's arrest and prior to an individualized hearing before an arraignment judge."

234.    The Amended Jail Bail Schedule was ordered "to ensure that all bail bond procedures are implemented in an orderly and expeditious manner."

235.    According to the Bail Schedule, the bond for a charge of rioting is $15,000.

236.    At the request of Defendant Prater, the court imposed bond on Plaintiffs Terry, Baker, Nabors, Hogsett, and Mack in the amount of $200,000 each for their Incitement to Riot charges—more than thirteen times higher than the amount set by the Bail Schedule.  None of the Plaintiffs could afford the bail, and BLM OKC posted the full amount for each Plaintiff.

237.    On or about June 30, 2020, Defendant VanNort sought and obtained an arrest warrant for the charge of felony incitement to riot against Plaintiff Webb based upon an Amended Affidavit of Probable Cause signed and sworn to by Defendant VanNort.  At the request of Defendant Prater, a warrant issued for Plaintiff Webb's arrest.

238.    Also at the request of Defendant Prater, the court imposed bond on Plaintiff Webb in the amount of $200,000—again, thirteen times higher than the amount set by the Bail Schedule.

239.     Also on June 30, 2020, Defendants sought and obtained a second warrant for Plaintiff Hogsett's arrest for the felony charge of threatening an act of violence.

240.    According to the Bail Schedule, the bond for a charge of threatening an act of violence is $2,000.

241.    At the request of DA Prater, the court imposed bond on Plaintiff Hogsett for this offense in the amount of $200,000—one hundred times the amount set by the Bail Schedule.

242.    As with the decision to impose felony charges, Defendants sought these unreasonably high bonds to punish Plaintiffs for their racial justice advocacy and criticism of the OCPD, to make an example out of Plaintiffs, and to deter other protestors from speaking out.  In addition, imposing pre-trial detention gives prosecutors leverage, increasing the likelihood that innocent people will plead guilty in order to end their confinement.

243.    The obscenely expensive bonds forced these young activists to stay in Oklahoma County's infamous jail, fearing for their lives.  In a report on the Oklahoma County Detention Center in 2021, the National Institute of Corrections found that "the sanitation of the facility was very disturbing" and "inmate safety and security is in constant jeopardy."

C.    Defendants call in the U.S Marshal Service to effect Plaintiffs' arrests.

244.    One function of the U.S. Marshal Service is to "provide assistance to state and local agencies in locating and apprehending their most violent fugitives."[6]

245.    In particular, the Marshals maintain an "Oklahoma City Metro Fugitive Task Force," which has as its purpose "to locate and apprehend federal, state and local fugitives."  The Task Force is comprised of the U.S. Marshals Service, the Oklahoma

---

[6] U.S. Department of Justice Office of Public Affairs, U.S. Marshals Service "Fact Sheet" (Feb. 17, 2022), https://www.usmarshals.gov/duties/factsheets/overview.pdf.

County Sheriff's Office, the OCPD, and other state and federal law enforcement agencies.  The OCPD has at least two officers assigned to the Task Force.  The OCPD and Oklahoma County District Attorney's Office work closely with the Marshal Service.

246.    Plaintiffs were not violent fugitives.

247.    Plaintiffs were simply young activists who exercised their constitutional right to freedom of speech and, in some cases, attempted unsuccessfully to file a complaint against an OCPD officer (Sgt. Wald).

248.    Nevertheless, the U.S. Marshal Service worked together with Defendants to effectuate Plaintiffs' arrests as if they had committed violent crimes.

249.    Police reports prepared by Defendant VanNort demonstrate that the OCPD and Defendant Prater were in constant communication with the Marshals throughout the arrests.  OCPD Officer Jason Hodges assisted the Marshals in guarding the perimeter of Defendant Nabors' house as they sought to find him and coordinated with and took direction from VanNort and Prater to seize evidence during the raid.

250.    In effecting the arrests, the Marshals acted on behalf of the OCPD and their actions are directly attributable to the OCPD.

> ### 1.    *The Unreasonable Pursuit of Plaintiffs Mack and Terry and Arrest and Detention of Sincere Terry*

251.    After learning about the incitement charges, Plaintiff Terry drove to a now-shut-down motel with Plaintiff Mack, a place they could afford for the night and plan their next steps, terrified of being arrested and held in Oklahoma County's dangerous jail. Neither could afford the $200,000 bail, and they feared being jailed indefinitely.

252.     The next morning, Plaintiffs Terry and Mack fled together to Texas and stayed with Plaintiff Terry's aunt.

253.     While in Texas, Plaintiff Terry learned that on or around June 29, 2020, U.S. Marshals swarmed her mother's car as she approached her home, searching for Terry.

254.     On that same date, OCPD officers also went looking for Plaintiff Terry at one of her places of work, OnCue, a convenience store in Oklahoma City.

255.     On July 1, 2020, Plaintiffs Terry and Mack learned that BLM OKC had raised sufficient funds to post their bonds, and they decided to turn themselves in. Knowing that U.S. Marshals had targeted her mother and raided Plaintiffs Webb's and Nabors' homes, Terry feared for her safety if she were to drive her own vehicle. Plaintiff Mack's mother drove Plaintiffs Terry and Mack to the Oklahoma County Detention Center, where Plaintiff Terry surrendered and was taken into custody.

256.     On July 2, 2020, cash bond was posted in the full amount, and Plaintiff Terry was released.

257.     In total, Plaintiff Terry spent two days in jail. She was never arraigned.

258.     On October 12, 2020, Defendant Prater dropped the incitement to riot charges. Plaintiff Terry pled guilty to obstruction of an officer, a misdemeanor. Plaintiff Terry received a two-year deferred sentence, unsupervised probation, and court costs.

### 2. *The Unreasonable Arrest and Detention of Mia Hogsett*

259.     On June 26, 2020, after learning about the incitement to riot charge against her, Plaintiff Hogsett drove to her mother's house to borrow her brother's car and some

clothing, terrified that her car would be recognized and rushing to leave the state as quickly as possible.  Then, she drove to stay with a friend in Kansas.

260.    On or about June 29, shortly before midnight, Plaintiff Hogsett returned to her home in Norman, Oklahoma for the first time since she learned of the charges against her.  She quickly collected some of her belongings and asked her roommate to drive her to Oklahoma City.  She was home for only thirty minutes.

261.    On or about June 30, 2020, at around 8:00 a.m., approximately ten to fifteen U.S. Marshals came to Plaintiff Hogsett's apartment in Norman to arrest her.  The Marshals entered the apartment with guns drawn and searched the entire apartment for Plaintiff Hogsett.  One of them slammed Plaintiff Hogsett's roommate against a wall.

262.    After the Marshals left, Plaintiff Hogsett's roommate called to tell her that the Marshals had been to their home and were looking for her.  Out of fear for her safety and the safety of her family and friends, on June 30, Plaintiff Hogsett turned herself in to the police.  She was taken into custody at the Oklahoma County Detention Center.

263.    On July 2, 2020, Plaintiff Hogsett was arraigned and entered a plea of not guilty on both the incitement to riot charge and the threatening an act of violence charge.

264.    On July 7, 2020, a cash bond was posted on her behalf.

265.    In total, Plaintiff Hogsett spent seven to eight days in jail on these charges. Throughout her detention, and while the charges remained pending after her release, Plaintiff Hogsett was terrified that Defendants Prater and OCPD would succeed in keeping her in jail for decades, fearing for her life.

266.    Even after her release, between June and October 2020, Plaintiff Hogsett lived in fear that U.S. Marshals would come after her again, and that this time they would kill her.

267.    On October 12, 2020, Defendant Prater dropped the incitement to riot charges.  Hogsett pled guilty to two misdemeanors, obstruction of an officer and threatening to perform an act of violence.  She received a two-year deferred sentence, unsupervised probation, and court costs.

### 3.    *The Unreasonable Arrest and Detention of Tyreke Baker*

268.    After learning of the charges against him, Plaintiff Baker's mother found friends' homes for him to stay in.  From June 26 through July 1, 2020, he moved around a lot, staying at friends' homes, trying to remain safe, until he, his family, and his attorney could determine what to do about the charge against him.

269.    On or about June 30, 2020, approximately twenty-five U.S. Marshals raided Plaintiff Baker's mother's home and demanded to know Baker's whereabouts.  The Marshals drew their guns and pointed them at Plaintiff Baker's fifteen-year-old brother and a family member who is a U.S. military veteran and suffers from PTSD, who were also present.  The Marshals finally left, having shocked and terrified Plaintiff Baker's family, after Baker's mother repeatedly insisted that she did not know where he was.

270.    On the morning of July 1, 2020, Plaintiff Baker understood his attorney as informing him that his bail had been fundraised.  Plaintiff Baker turned himself into the police, expecting only to stay in the notoriously dangerous jail for fifteen minutes. However, he was taken into custody at the Oklahoma County Detention Center.

271.    On July 2, 2020, cash bond was posted in the amount of $200,000, and he was released that evening, at around 7:00 p.m.

272.    In total, Plaintiff Baker spent two days in jail.  He was never arraigned.

273.    On October 12, 2020, Defendant Prater dropped the incitement to riot charges.  Plaintiff Baker pled guilty to misdemeanor obstruction of an officer.  Plaintiff Baker received a two-year deferred sentence, unsupervised probation, and court costs.

### 4.    The Unreasonable Arrest and Detention of Preston Nabors

274.    After Plaintiff Nabors learned about the charge against him, he immediately went home to his father's house in Oklahoma City.

275.    The next day, Plaintiff Nabors moved to stay at a friend's house, fearing that he would be arrested and jailed if he stayed at home.  Over the next couple of days, Plaintiff Nabors moved between friends' houses, only leaving when he felt he needed to change locations for his safety or to briefly check in on his father's house while his father was on vacation.

276.    On or about June 30, 2020, Plaintiff Nabors was at home when he heard from other Plaintiffs that U.S. Marshals were seeking to arrest each of them.  Nabors went outside and saw four or five police cruisers about 200 yards away across the street.  Terrified, Nabors ran to the back of his neighbor's house and called a friend to pick him up.

277.    The U.S. Marshals called Plaintiff Nabors by phone, but he did not answer.

278.    Plaintiff Nabors then received two text messages that read: "Preston, this is Brett Stephens with the US marshals service . . . your warrant has been passed to us,

please call me back so we can handle this quickly and safely . . . I've been in contact with your father" and "I can see that you've read the message, we can make this easy and keep your family un involved if you would just call me back."

279.    Meanwhile, ten to fifteen law enforcement officials—U.S. Marshals and at least one OCPD officer, OCPD Lieutenant Hodges—surrounded, entered, and searched Nabors' father's home.  During the search, a Sgt. Samuels informed Lt. Hodges that they had found a gun in the house.  Lt. Hodges called Defendant VanNort and asked whether he wanted the rifle.  Defendant VanNort requested a photo of the gun, and Lt. Hodges entered the house, took a photo and sent it to Defendant VanNort.  Defendant VanNort subsequently called back and stated that Defendant Prater wanted the rifle.  Lt. Hodges took Plaintiff Nabors' rifle into custody.

280.    In the process of seizing the rifle, somebody discharged the gun and shot a bullet into the wall of Nabors' bedroom, which continues to remind Plaintiff Nabors of this terrifying day.

281.    To this day, the OCPD still has not returned Plaintiff Nabors' lawfully owned rifle.

282.    On June 30, 2020, shortly after learning of the U.S. Marshals' raid on his home, Plaintiff Nabors turned himself in out of fear for his safety and the safety of his family and friends.  He was taken into custody in the Oklahoma County Detention Center.

283.    On July 2, 2020, Nabors pled not guilty.  He remained in detention following his plea.

284.   On July 7, 2020, Nabors' bond was posted.

285.   In total, Plaintiff Nabors spent around seven to eight days in jail.

286.   On October 12, 2020, Defendant Prater dropped the incitement to riot charges.  Plaintiff Nabors pled guilty to misdemeanor obstruction of an officer.  He was given a two-year deferred sentence, unsupervised probation, and court costs.

### 5.   *The Unreasonable Arrest and Detention of Trevour Webb*

287.   On June 26, 2020, after learning about the incitement to riot charges against the other Plaintiffs, Webb went home and remained there for several days, waiting to hear whether Defendant Prater brought charges against him as well.  Webb did not participate in any protests between June 27 and June 30, 2020, out of concern for his safety.

288.   Early on the morning of June 30, 2020, Webb was at home, unaware that Defendant Prater had requested a warrant for his arrest, when he observed multiple, unmarked, white Chevy Impalas drive down an alleyway next to his house.  The cars parked on the street by his front yard.  Fifteen to twenty U.S. Marshals came to his front door with shields and guns drawn.  Webb answered the door in his underwear.

289.   The Marshals informed Webb that they were going to search his house and proceeded to do so.  The Marshals then instructed Webb to get on his hands and knees and to crawl onto the front porch and onto the lawn.  Webb asked to be allowed to put on clothes and shoes first, but the Marshals refused.  Webb then crawled from his house out onto his front lawn, still barefoot and in his underwear.  The Marshals handcuffed him and took him to jail, at the Oklahoma County Detention Center.

290.   At the jail, one of the Marshals referred to Webb as "one of the rioters."

291.    When the Marshals arrived, Plaintiff Webb's wife and child were driving two to three blocks away from their home.  Other Marshals stopped her car with guns drawn, identified themselves, and told Webb's wife and child that Webb had done "really bad things" and was armed and dangerous.

292.    The next day, Webb was arraigned and entered a plea of not guilty.  He remained in detention following his arraignment.

293.    On July 7, 2020, cash bond was posted for the full amount of the bond.

294.    In total, Plaintiff Webb spent seven to eight days in jail.

295.    On October 12, 2020, Defendant Prater dropped the incitement to riot charges.  Plaintiff Webb pled guilty to obstruction of an officer, a misdemeanor.  Webb received a two-year deferred sentence with unsupervised probation and court costs.

296.    Webb accepted the plea deal in part because Defendant Prater warned him that he risked never being able to see his children again by going to trial.

297.    After accepting the plea deal, Plaintiff Webb met with Defendant Prater in Prater's office.  Defendant Prater warned Webb that because he's a Black man he would get killed by the police if he continued to go out in public with his gun.

298.    Defendant David Prater showed Plaintiff Webb a photo of him at an armed march protesting racist police violence and supporting the gun rights of Black Oklahomans and told Plaintiff Webb that an OCPD officer took the photograph.

299.    Defendant Prater admitted he was angry about the things the Plaintiffs said to Sgt. Wald, and their conduct.  He further admitted that charging Plaintiffs with incitement to riot was not the "way to go."

**6.      The Unreasonable and Racially Discriminatory
Issuance of a Warrant Against Austin Mack**

300.    On June 23, 2020, at the time of the incident at the mural event, Plaintiff

Mack was at the gym.

301.    Nonetheless, on June 26, 2020, Defendants obtained an arrest warrant

against Mack in connection with his (alleged but non-existent) presence at the mural

event.  In each of the initial Affidavits for the arrests of Plaintiffs Baker, Nabors, Terry,

and Hogsett, the OCPD falsely stated that Mack was there and played a role in the

encounter with Sgt. Wald.

302.    As set forth above, Plaintiff Mack fled to a motel with Plaintiff Terry that

night and to Texas the following morning, afraid to stay in Oklahoma.

303.    On June 30, 2020, the warrant was amended to remove Plaintiff Mack and

replace him with Plaintiff Webb.  However, neither Plaintiff Mack nor his attorney were

informed of this change.  In his investigative report, Defendant VanNort explained that

he had mistakenly confused Mack for Webb because the two men bore a "striking

resemblance."

304.    Other than the fact that they are both Black men, Mack and Webb look

nothing alike.  Mack is 6'1," while Webb is 5'8".  Mack has a darker skin tone and is

more muscular than Webb.

305.    Defendant VanNort identified Plaintiff Mack because of his leadership in

the June 2020 protests and because Plaintiff Terry had tagged him on her social media

page. Plaintiff Mack appeared in a photo with Terry and others, in front of a red, black, and green flag holding up their fists.

306.    While Plaintiff Mack remained in Texas, his attorney called Defendant Prater several times to explain that Plaintiff Mack had been erroneously charged because he was not present at the time of the incident with Sgt. Wald. Prater did not believe that was true. Plaintiff Mack provided video footage of him at the gym at the exact time of the Wald encounter, at which point Prater had to agree that Plaintiff Mack was not present at the mural incident.

307.    On or about July 1, 2020, Plaintiffs Terry and Mack learned that BLM OKC would pay their full bail, and Plaintiff Mack's mother drove them to the Oklahoma County Detention Center.

308.    There, Plaintiff Mack planned to turn himself in to the police; however, before going inside, Plaintiff Mack's attorney informed him that the warrant was no longer outstanding for his arrest. He spoke to the press about his experience and these wrongful accusations and then went home.

309.    On or about July 2, 2020, Defendant Prater met with Plaintiff Mack in person. Defendant Prater informed Plaintiff Mack that he would expunge his record because of the mistake.

    D.    Defendants have chilled Plaintiffs' speech and caused lasting harm.

310.    The Plaintiffs' nightly protests ended the very night Plaintiffs were charged with incitement to riot. Nearly a month of nightly protests outside OCPD headquarters

from 7:00 p.m. to around 7:00 a.m., organized and led by Plaintiffs abruptly came to a halt.

311.    The charges ended a protest in real time, as Plaintiffs learned about their charges while protesting another police killing.

312.    Plaintiffs initially hoped that by staying in the public eye, Defendant Prater and the OCPD could not continue to retaliate against them and may even be convinced to drop the incitement to riot charges.  For the first month after being charged, detained, and released, Plaintiffs participated in weekly protests near the courthouse, which they called "Moral Mondays."  These protests focused narrowly on holding Defendant Prater and the OCPD accountable for their and other racial justice protesters' unjust arrests in hopes that public pressure would cause Prater to back down.  Plaintiffs refrained from protest activity directed at criticizing OCPD more broadly for its brutal and racist policing practices.

313.    Plaintiffs' probation status and OCPD's continued surveillance and targeting of Plaintiffs caused them to fear additional retaliation and to restrict their protesting out of fear for their safety.

314.    Since their arrests, each Plaintiff's speech has been chilled, and each Plaintiff has faced additional lasting harm, as a result of Defendants' retaliatory actions.

315.    Today, while Plaintiffs continue to engage in protected political speech, their previous arrests, prosecution and targeting, and fear of ongoing retaliatory action have fundamentally changed how they protest.  To the extent Plaintiffs continue protesting, many no longer play leadership roles in protests.  Nor do they speak from the

streets, lead chants or marches, or dialogue with police officers. They avoid expressive activity that could draw attention to themselves for fear they will again face further retaliatory action based on their viewpoints. All Plaintiffs have limited their speech and changed the way they protest out of fear of arrest and further targeting.

316. Other activists have also been dissuaded from engaging in protected First Amendment Activities because of Plaintiffs' experiences.

317. In general, Plaintiffs Hogsett and Webb estimate that anywhere from 65-80% of people stopped coming to protests after the Plaintiffs were arrested for incitement to riot. After about 30 days of protesting after George Floyd's murder, the number of protesters started to thin out. Once Plaintiffs were released from jail in early July 2020, the number of people attending protests had dropped by about half.

### 1. *Plaintiff Terry*

318. After her plea agreement, Plaintiff Terry did not go out to protest for over a year, except on rare occasions when she felt she must overcome her fear for her safety due to the injustice of the OCPD's actions. For example, on December 11, 2020, Plaintiff Terry attended a protest in response to OCPD officers killing Bennie Edwards, a 60-year-old Black man. At that protest, an OCPD officer attempted to his Plaintiff Terry with a baton. While prior to her arrest, she would protest on a daily basis, Plaintiff Terry did not attend another protest for months out of fear for her safety.

319. In 2021, Plaintiff Terry slowly and cautiously began attending protests for racial justice again; however, she still fears retaliation by the OCPD and Defendant Prater. Terry is very cautious about where and how she chooses to express herself. She

no longer leads chants on the bullhorn.  She no longer directs the progression or stands in the front of marches.  She stays in the back and tries not to draw any attention to herself.  She believes the City targets protesters who stand out as leaders.  She feels censured in her protesting and unable to speak freely.  If Terry felt safe doing so, she would continue to participate in protests as fully as before her arrest.

320.    OCPD officers continued to target Plaintiff Terry after she was released, saying things to her like "see you inside, Sincere," referring to her time in jail.

321.    For example, on January 6, 2021, OCPD officers approached Terry at a peaceful counter-rally, protesting MAGA supporters at the Oklahoma City capital, and said, "We'll see you later, Sincere," which she understood as also referring to her time in jail.

322.    OCPD officers continue to speak to Terry in this manner when they see her, both at and outside of protests.

323.    Plaintiff Terry lost her jobs because of her arrest.  OnCue fired her after the OCPD went there searching for her.  After her release from jail, Plaintiff Terry attempted to return to her job as a front desk receptionist at the Hilton in Oklahoma City; however, she learned that due to her absence, she had been let go from her job.

324.    At the time of her arrest, Plaintiff Terry was a freshman at the University of Central Oklahoma studying pre-med.  After losing her employment, Terry could not afford to continue attending classes.

325.    During this time, Plaintiff Terry also lost her car and her apartment because she could not afford to make her payments.  In July 2020, she moved in with her mother.

326.     On February 11, 2021, after almost a year of applying to jobs, Plaintiff Terry finally secured employment at Costco.  She plans to re-enroll at the University of Central Oklahoma in the Fall of 2022, as a pre-law major due to the harm her arrests have caused her.

### 2.     *Plaintiff Hogsett*

327.     In the aftermath of her arrests, Plaintiff Hogsett severely limits her statements when posting on social media and she does not post anything that is overtly critical of the police, for fear of retaliation.

328.     Although she used to attend daily protests prior to her arrest, in the Fall of 2020 and Winter of 2020-21, Plaintiff Hogsett only participated in protests on rare occasions when she felt motivated to overcome her fear for her safety due to the injustice of the OCPD's actions.  Even then, she did so in a fundamentally different manner than prior to her arrests.  For example, on September 23, 2020, Plaintiff Hogsett attended a protest of the not guilty verdict for the officers who killed Breonna Taylor, a Black woman shot and killed in her apartment by Louisville, Kentucky police during a no-knock raid.  Plaintiff Hogsett participated in the protest only when the music took a softer tone, changing from "Fuck tha Police" by N.W.A to "Change is Gonna Come" by Sam Cooke.  She stayed on the sidewalk, too afraid to join other protesters in the street.

329.     On December 11, 2020, Plaintiff Hogsett attended a protest in response to OCPD officers killing Bennie Edwards, a 60-year-old Black man.  At that protest, Plaintiff Hogsett was hit with a baton by an OCPD officer.  Hogsett did not attend another protest for months out of fear for her safety.

330.     In 2021, Plaintiff Hogsett attended several peaceful protests downtown, but stayed on the sidewalk, too fearful of joining other protestors on the street.  She often stayed several blocks away from the protests out of fear of arrest by the police.  On occasion, protesters would see how far away from the protest she was and would ask her to hold and watch their children as they protested.  If Hogsett felt safe doing so, she would continue to participate in protests as fully as before her arrest.

331.     During this time, police officers would identify Plaintiff Hogsett, addressing her by name in public places.  A police investigator followed her, and officers stopped her vehicle multiple times for minor traffic infringements.

332.     Currently, Plaintiff Hogsett will only attend a protest when organizers can assure her that all permits have been acquired and that it will remain calm.  She no longer feels safe attending many protests criticizing the police and fighting for racial justice.

333.     Plaintiff Hogsett suffers from daily nightmares.  Her nightmares diminished when she moved out of the apartment where the U.S. Marshals went to search for her, in April 2021.  Still, even with a new apartment, Hogsett feels safest when she visits her mother out of state.

334.     Plaintiff Hogsett lost her job after her arrest.  She was previously employed as a hairdresser at a prestigious salon in Oklahoma City, but after her arrest she lost her job.  The salon ordered her to resign, and her boss told her that their clientele—which included local politicians—would be uncomfortable with her presence at the salon.

335.     After entering her plea agreement, Plaintiff Hogsett felt well enough to search for a job for the first time since her arrests and began making deliveries with

DoorDash and freelancing as a hairstylist.  She continues to work both jobs, but the ongoing fear, stress, and paranoia she experiences as a result of Defendants' treatment of her, prevent her from being able to maintain full time employment.

### 3.    *Plaintiff Baker*

336.    Since his plea agreement, Plaintiff Baker has limited his protest activity to journalism work from the sidelines for fear that any racial justice protest activity will lead to another arrest and more jail time.  Plaintiff Baker keeps his distance from police officers whenever he reports on a protest.

337.    Plaintiff Baker also limits his attendance at and reporting on protests to events where he knows the organizers because he is terrified that something unpredictable will happen and the police will arrest him for his presence or filming.

338.    Plaintiff Baker no longer feels safe attending and reporting on protests criticizing the police; he delegates reporting of criminal justice issues to others on his team.  If Baker felt safe doing so, he would continue to participate in protests as fully as before his arrest.

339.    Plaintiff Baker's arrest and time in jail had a severe impact on his mental health.  Plaintiff Baker was still mourning his brother's death, which occurred in 2016, when these charges were brought against him.

340.    Since his arrest, Plaintiff Baker has anxiety while he drives, worried the OCPD will pull him over.  He avoids certain neighborhoods where he knows police are more likely to be present, scared for his safety.  Plaintiff Baker also has frequent nightmares about the police coming after him.

### 4.      *Plaintiff Nabors*

341.    In the aftermath of his arrest, Plaintiff Nabors only attends protests as a bystander.  He no longer participates in marches, even if it is a permitted event.  Instead, when he participates in a protest, he does so from the sidewalk, always filming.  He fears that protesting will again make him a target of the OCPD and Defendant Prater.  If he felt safe doing so, Nabors would participate in protests as fully as he did before his arrest.

342.    Plaintiff Nabors has remained terrified that the OCPD and Defendant Prater will find a way to arrest and bring charges against him.  Plaintiff Nabors will often change directions when driving if he sees a police car.  For over a year after his arrest, he also stopped going out socially to limit his risk of police interaction.

343.    Currently, Plaintiff Nabors will leave his home only for important social occasions, like friends' or family's birthdays.

344.    Plaintiff Nabors' arrest changed what he believed was possible for his future and political aspirations.  Had Plaintiff Nabors not been arrested, he would have continued to participate in and lead bold activism efforts challenging police misconduct and racial injustice.

### 5.      *Plaintiff Webb*

345.    In the aftermath of his arrest, Plaintiff Webb fears being too engaged at protests and no longer feels comfortable using a megaphone or taking a similar public role.  Plaintiff Webb now only participates in protests on the sidelines and makes sure to stay far away from the police.  If someone yells, "Black Lives Matter," he instinctively

moves away from them out of fear of the OCPD's response.  If he felt safe doing so, Webb would participate in protests as fully as he did before his arrest.

346.   Plaintiff Webb lost his job at a marijuana dispensary after his arrest. Plaintiff Webb applied to around thirty to forty jobs over the month that followed before getting an offer of employment.  He was finally hired for a window-cleaning job, but his hopes for his future have changed.  He fears that he will not be able to improve his employment prospects as a result of his arrest.

347.   Plaintiff Webb remains fearful that police are following him after his arrest, which has affected his day-to-day life and the way he travels around Oklahoma City.

348.   Plaintiff Webb has frequent nightmares and constantly checks his security cameras, worried that the OCPD are coming to attack him and his family.  He hoped to move from the home where the U.S. Marshals arrested him, but he has been unable to do so for financial reasons.

### 6.   *Plaintiff Mack*

349.   Plaintiff Mack continued to protest after his warrant was withdrawn, believing that it was his duty to overcome his fear for his safety.

350.   The OCPD continued to surveil and harass Plaintiff Mack due to his protest activity.  During the first two months after the mural incident and incitement charges, OCPD officers stopped Plaintiff Mack no fewer than eight times for alleged traffic violations.

351.    On multiple occasions, OCPD officers stopped Plaintiff Mack when he was leaving a rally, just outside the protest area.  Oftentimes, officers falsely claimed Plaintiff Mack had a taillight out, but he did not have taillight out.  This happened repeatedly.

352.    In at least one of those stops, on November 11, 2020, OCPD officers stopped Plaintiff Mack immediately following his departure from a protest calling for an investigation into the OCPD's killing of 17-year-old Isiah Lewis.  At this stop, and on multiple other occasions, the officer asked him "where your friends at?," which Mack understood as a reference to his racial justice activism.  The officer issued him five tickets and arrested him.  Plaintiff Mack was especially concerned because this same officer had previously killed Black people while on duty.

353.    During another traffic stop in November 2020, an OCPD officer approached Plaintiff Mack with his gun drawn.  Mack learned to provide officers with his license and registration without his hands leaving the officers' view because he feared for his life and knew they would continue to target him due to his racial justice protesting. The tickets cost Mack thousands of dollars, and he still owes over $1,000 in fines and fees related to those stops.

354.    OCPD routinely harassed Plaintiff Mack through traffic stops until Spring 2021, when he purchased a new vehicle that the OCPD did not recognize.

355.    On December 11, 2020, Plaintiff Mack attended the Bennie Edwards protest.  An OCPD officer pepper sprayed Mack in his eye, while Mack's hands were raised in the air and he stood on the lawful side of the caution tape.

356.     The OCPD's ongoing conduct increased Plaintiff Mack's fear of arrest and prosecution for engaging in speech, organizing, or participating in demonstrations that constitute permissible and protected speech.  This fear also stemmed from Plaintiff Mack's past experience with police violence at protests.  Because of this fear, Mack refrained from participating in protests for almost a year.

357.     However, in November 2021, Plaintiff Mack participated in numerous protests, vigils, and events in support of the commutation of Julius Jones, a Black man sentenced to death in Oklahoma following an unfair trial.  While he still feared for his safety, the injustice of Jones' possible execution motivated him to attend.  He participated cautiously with the knowledge that OCPD officers know his name and face.  He did not organize any of the events and did not play any leadership roles for fear of arrest and prosecution.

358.     Plaintiff Mack has not participated in any protests since November 2021.  If he felt safe doing so, Plaintiff Mack would participate in protests as fully as before.

359.     After the warrant was issued for his arrest, Plaintiff Mack was fired from his job delivering for Amazon because of his absence, while he was in Texas.  Plaintiff Mack applied to approximately 100 jobs thereafter, but he did not receive a reply from any of them.  He is currently only able to find employment through a temp agency.

## VIII.  The City adopted and continues to maintain a policy, practice and/or custom of suppressing the First Amendment activity of racial justice advocates.

360.     OCPD adopted and continues to maintain a policy, practice and/or custom of arresting, prosecuting, and targeting racial justice protestors based on their speech and

the content of their speech, both in conjunction with Defendant Prater and independently. This policy, practice, and/or custom began during the George Floyd protests and continues to this day with intentional targeting, intimidation, harassment, use of force, wrongful arrests, traffic stops and other unreasonable restrictions on protesters' First Amendment-protected conduct, often unprovoked and without fair warning to Plaintiffs and other racial justice activists.

361.    From May 30, 2020 through June 20, 2020, the OCPD engaged in repeated, widespread violations of law, as outlined above, including arresting protestors because they disagreed with their messages critical of police and in retaliation for their First Amendment activity; imposing a curfew without accommodating the right to peaceable assembly and protest; declaring unlawful assemblies without adequate sound amplification and without providing adequate notice, means and opportunity to disperse before taking aggressive police action including the use of tear gas, bean bag rounds, mace, and use of force; hitting large numbers of peaceful protestors with batons, hands, less lethal force and/or using chemical weapons on them all with unreasonable and excessive force; driving towards peaceful racial justice protesters at high speeds only to stop just before running into them; and failing to provide medical aid or decontamination to persons defendant officers teargassed.

A.    Chief Gourley was on notice of OCPD's violations
of protestors' First Amendment Rights and repeatedly failed to act.

362.    On May 30, 2020, soon after the arrests occurred, civil and human rights advocate Sara Bana telephoned OCPD Chief Gourley to ask him to pull his officers back

from indiscriminately arresting and using force against racial justice protestors to suppress their speech. She urged him to consider the context of George Floyd's murder and the pain that it had caused before retraumatizing racial justice protestors. In response, Chief Gourley stated, "Oklahoma City is not Seattle." Gourley said he stood by his officers and was going to let them do what they needed to do in their professional judgment.

363. During Oklahoma City Council hearings attended by OCPD Chief Gourley, multiple Oklahoma City residents complained about the OCPD's unlawful arrests, excessive use of force, and use of tear gas against racial justice advocates criticizing the OCPD at the George Floyd protests. For example, during a City Council hearing on the police budget on June 2, 2020:

a. One citizen of Ward 6 described how "OCPD chose to repeatedly use tear gas, rubber bullets and the like to disperse peaceful protestors and hid behind claims of destruction and violence by few to do harm to many."

b. A community member described how police respond to criticism with "chemical weapons and rubber bullets."

c. A community member described how police used excessive and unjustified force against peaceful protestors.

d. Another community member described how he witnessed a woman holding a sign on May 30, 2020 get her head split open with a tear gas cannister, protestors shot with rubber bullets over and over, and instead of police shooting them off the ground like they're supposed to, he saw them shot at a 90-degree angle "square on."

e. Another community member, a combat veteran, said that the OCPD's use of "equipment and tactics" on protestors "to intimidate and oppress" on May 30 and 31 were "of a higher caliber than what [he] was given as a marine during Operation Enduring Freedom.

She noted that weapons and chemical agents were used against "American citizens that were exercising their First Amendment Right."

f.     Another community member, the mother of a woman hit with rubber bullets on May 30 described how police were ready with riot gear and "clicking their sticks" when a group of young protestors rounded a corner.

364.    On June 2, when Chief Gourley was asked whether he would apologize for his officers' misconduct, Chief Gourley stated he didn't think he has "anything to apologize for now."

365.    On June 16, 2020, during another City Council Police Budget meeting where Chief Gourley was present, multiple OCPD residents again raised concerns that the OCPD used unlawful tactics to suppress the speech of racial justice protestors expressing statements critical of the OCPD.

a.     An Oklahoma City resident read a statement from his former student, who described how on May 31, the OCPD threw tear gas canisters at peaceful protestors, including himself. One of the cannisters exploded violently, severely burning a man on his left hand. Another cannister landed near girls who were 14 or 15 years old. When he went to assist them and pour water on the cannister, the OCPD hit the student with what he believed was a rubber bullet, blasting his skin and flesh and the back of his hand down to his tendon, causing his hands to bleed profusely, and breaking two bones. According to the student, "[t]he muscle tissue that gives your fingers the ability to grip and press is partially gone. Even after stitches and 16 days the wound isn't healing because of the profound tissue damage."

b.     Another protestor described how she was at the protest when they were attacked with tear gas and hit with a rubber bullet.

c.     Another protestor stated: "As citizens we have the right and obligation to protest and correct the wrong, it is shameful when the

police attack peaceful protestors and use intimidation to reduce exercising our rights."

d.    Another protestor described how protestors were asking Gourley to follow their policies and de-escalate, and that "[t]hey did not and deliberately said they would continue to engage violently with peaceful protestors."

366.    In August 2020, a coalition of racial justice activists wrote a letter to the City, OCPD, and Defendant Prater demanding that they end First Amendment violations of protesters' rights.  The list of demands included a requirement that independent prosecutors handle cases of officer-involved shootings, a requirement that OCPD officers reside in Oklahoma City, and a requirement that all officers wear body cameras and turn them on during encounters with civilians.  The group also demanded an end to qualified immunity for officers.[7]

367.    At a City Council meeting on December 22, 2020, Cherisse Baker, Plaintiff Bakers mother, spoke about Plaintiff Baker's arrest and how his rights as an independent journalist were infringed.  She described how OCPD aggressively sent fifteen to twenty U.S. Marshals looking for Plaintiffs.

368.    According to a presentation the OCPD later delivered to the Police Task Force, no officers were disciplined for any of misconduct, and all OCPD officers were found to be justified.

---

[7] Brett Dickerson, "Two months later, OKC protestors and police take a very different approach," *Oklahoma City Free* Press (August 2, 2020), https://freepressokc.com/two-months-later-okc-protesters-and-police-take-a-very-different-approach/.

B.     The targeting of Plaintiffs is part of a broader pattern of OCPD
       retaliation against racial justice protestors who criticize the police.

369.   The surveilling, targeting, harassing, arresting, detaining and use of force

towards Plaintiffs, as detailed above, are part of OCPD's larger custom and practice of

retaliation against racial justice protestors because of disagreement with their viewpoint

and message.  OCPD officers had and have no legitimate reason to post Plaintiffs' photos

on the wall at police headquarters, to refuse to take their complaints, to follow and

videotape them, to arrest and detain them without probable cause, to call out to them by

name on the street in menacing ways.  All this, and the other facts alleged above, is part

of a custom and practice of harassing people who dare to criticize the OCPD for its

racially biased policing practices.

370.   Moreover, the OCPD has not limited its retaliatory conduct to these

Plaintiffs.  As referenced in Part VI.C above and detailed further below, OCPD also

sought the unjustified arrest and detention of other racial justice protestors who spoke out

against the OCPD in a series of warrants issued on June 26.  As with each of the

Plaintiffs, for several of these individuals, the OCPD-drafted Affidavits of Probable

Cause in these other cases are replete with references to First Amendment activity with

which OCPD disagrees.

371.   For example, OCPD went after Eric Ruffin, a protestor who documented

the George Floyd protests on video.  The OCPD-drafted Affidavit of Probable Cause for

Eric Ruffin relies on conduct protected by the First Amendment, including that "Ruffin

recorded many of the events" of the May 30, 2020 George Floyd protest and that he made

political statements like "Fuck peace, they didn't give a fuck about shit when they did what they did," "They can't stop shit," "The police are going to keep on doing this bullshit because they don't got no consequences at the end of the day," and "Every single on[e] of them niggas that kill black people, every single one of them niggas needs to die." None of the statements included in the affidavit amount to terrorism.  Ruffin did not advocate specific acts of violence.  Nor is he alleged to have directed anyone to engage in any of the unlawful acts the affidavit attributes to others.  Yet, based on the Affidavit, Defendant Prater charged Ruffin with Terrorism.  Both counts of Terrorism were dismissed, and he pled guilty to a misdemeanor.

372.    The OCPD-drafted Affidavits Of Probable Cause for Malachai Davis, a protester charged with Terrorism, and James Holt, Saxon Weber, Daniel Dickerson, and Adam Hayhurst, protesters charged with Riot and other felony charges, rely on the protected expressive conduct of "the crowd . . . standing in the street," protesters "carrying flags that were identified as belonging to the following groups: ANTIFA, Soviet Union (Communism), American Indian Movement, Anarcho-Communism (solid red), and the original Oklahoma flag (red with '46' inside a star) (currently adopted by Oklahoma Socialists)," and protesters carrying "a variety of handmade signs that supported ANTIFA, Black Lives Matter, reproductive justice, George Floyd, anti-police and anti-government positions." The felony Terrorism and other charges against Davis and Weber were dismissed or deferred, and Davis pleaded guilty to a misdemeanor.

373.    In addition, OCPD arrested other protestors for engaging in protected First Amendment activities during the early George Floyd protests.  Of the individuals arrested

by the OCPD during May 31 and June 2, the charges against at least 16 people were declined, declined due to lack of predicate facts, or dismissed by the Court.

374.    Despite the fact that he was never arrested, OCPD continued to target Plaintiff Mack through traffic stops because of his criticism of the police and involvement in racial justice protests and referencing his protest activity during some of these stops, as discussed above in Section VII.D.6.

375.    OCPD officers continue to subject Plaintiff Terry to ongoing surveillance and harassment to this day.  Police officers comment that they will see her again soon and call out her name in shopping centers and other public places, as detailed in Section VII.D.1.  The OCPD also continues to use unlawful tactics to intimidate protestors other than Plaintiffs with its ongoing custom, policy, or practice of suppressing the First Amendment activity of racial justice advocates critical of the police, and OCPD in particular.

376.    The OCPD has singularly targets protests and protestors expressing messages critical of the police.  Protestors with different messages receive different treatment.

377.    For example, on December 11, 2020, grassroots activists held a protest in response to the killing of Bennie Edwards, a 60-year-old Black man with schizophrenia and bipolar disorder.  OCPD officers shot Edwards in the back while he was running away from them.  Protesters gathered immediately following the shooting, as Edward lay dead in the parking lot.  Plaintiffs had largely stopped attending protests, but the injustice of this particular killing motivated them to attend.

378.    Throughout the protest, OCPD officers stood behind caution tape, threatening protesters, "get back or we'll arrest you."

379.    OCPD also used unjustified force against protestors.  During the protest, OCPD officers went straight for Plaintiffs Terry and Hogsett even though they were standing on the lawful side of the caution tape.  An OCPD officer crossed the caution tape to threaten Terry with a baton.  Hogsett stepped between Terry and the officer, and the officer struck Hogsett with the baton.

380.    An OCPD officer pepper sprayed Plaintiff Mack directly in his eyes while he stood with his hands in the air.  Another officer pepper sprayed Terry.  Other OCPD officers pepper sprayed other protestors without provocation or justification.

381.    On December 12, 2020, a mobile caravan of racial justice advocates drove within the speed limit to protest the killings of Bennie Edwards and Stavian Rodriguez. Rodriguez, a fifteen-year-old, had been shot and killed by police officers in November 2020 during an alleged armed robbery in southwest Oklahoma City.  Approximately four Oklahoma City police cruisers appeared at the caravan and targeted and stopped the lead car in the caravan, driven by Dominique Gray, an African American man.

382.    By contrast, Defendants have responded to other protests without using the brutal tactics employed against those who protest police misconduct.  In other words, the message of the protest determines whether Defendants respond with unjustified arrests, stops, and violent tactics—or if at all.

383.    For example, on October 3, 2020, supporters of former President Trump organized a MAGA rally, called "MAGA DRAG." As part of this protest, hundreds of

Trump supporters gathered in front of the state capital and drove around the streets of

Oklahoma City and the interstate system in a caravan, blocking and slowing traffic.  The

OCPD made no arrests or traffic stops of vehicles in this caravan.  Instead, OCPD

allowed the rolling group of pro-Trump agitators to continue unhindered.

384.    At the 2AOK rally in April 2021, armed protestors amassed inside and

outside the Capitol to protest gun control laws.  The OCPD did not attend, nor did it take

any action to control protestors.  Only Capitol security was present.

385.    In February 2022, dozens of predominantly white protestors parked on

highways and overpasses in Oklahoma City to support the People's Convoy, an eight-

mile line of vehicles protesting vaccine mandates and Covid-19 restrictions.  Although

dozens of cars illegally parked on Oklahoma City streets and the Caravan slowed and

obstructed traffic, the OCPD took no action against the protestors.

386.    At the May 14, 2022 Bans Off Our Bodies Rally in Oklahoma City,

hundreds of people protested outside and inside the Capitol all morning and most of the

afternoon.  OCPD officers did not attend.  Only Oklahoma Highway Patrol Officers

attended and simply maintained a line between the rally attendees and counter-protesters.

387.    As recently as June 3, 2022, however, OCPD leveled threats and

harassment at peaceful racial justice protestors.  These protestors were demonstrating

outside the Oklahoma City Courthouse after being asked to leave a courtroom where the

trial of two young Black men was being conducted.  At approximately 7:00 p.m., the

presiding Judge's clerks came out to tell them to leave the area under threat of arrest.  To

support this threat, around five or six OCPD cruisers moved closer to the protesters.  The

protestors responded by dispersing.

388.    During this same outdoor protest, attorneys from the District Attorney's

Office directed protestors including Cherisse Baker, Plaintiff Baker's mother, to end their

Facebook Live streams or they would be charged with jury tampering.

## CLAIMS FOR RELIEF

### COUNT I – Violation of the First Amendment
### (Freedom of Speech, Freedom of Press, Retaliatory Arrest and Prosecution)

389.    Plaintiffs reallege and incorporate by reference all of the preceding

paragraphs in this Complaint.

390.    All Plaintiffs bring this claim against Defendant VanNort and the Doe

Defendants for damages, against the City for damages, injunctive and declaratory relief,

and against Defendant Prater in his official capacity for injunctive relief.

391.    Each Plaintiff has engaged and plans to continue to engage in

constitutionally-protected speech and conduct.  Each Plaintiff has engaged and plans to

continue to engage in political activism to challenge racist police violence and to

advocate for racial justice.  Each Plaintiff has engaged in speech critical of Defendants

and plans to continue to do so until such time as Defendants stop engaging in unjustified

violence and discrimination against Black people and people of color.

392.    Plaintiff Baker has engaged and continues to engage in constitutionally-

protected reporting to disseminate important information, including information critical

of OCPD's policing practices, to Oklahoma City residents, and the rest of the nation. Plaintiff Baker plans to continue to do so.

393.   Defendants—individually and pursuant to municipal policy, custom, or practice—retaliated against Plaintiffs for their protected speech by surveilling them, threatening them, and subjecting them to unjustified warrants, arrest, detention and/or prosecution, and the imposition of excessive bail, and for Plaintiff Mack traffic stops.

394.   There was no probable cause for Plaintiffs' arrests and prosecution.

395.   Defendants violated and continue to violate well-established protections for the exercise of speech and assembly in public places.

396.   Defendants' retaliatory conduct, including targeting, threatening, surveilling, arresting, jailing and prosecuting Plaintiffs, would not have occurred and would not continue to occur but for their protected speech, specifically, political activism, journalism, and advocacy concerning police violence.

397.   Defendants' targeting, surveilling, arresting, and detaining of Plaintiffs occurred pursuant to an official municipal policy, practice, and/or custom of retaliating against racial justice protestors for their protected First Amendment activity (including journalism) and/or engaging in viewpoint discrimination against racial justice protestors. The City, through its final policymakers, has devised, implemented, sanctioned, ratified, and/or acted with deliberate indifference to the City Defendants' retaliatory conduct. The City's acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' First Amendment rights. By acting under color of state

law to deprive Plaintiffs of their First Amendment rights, Defendants have violated 42
U.S.C. § 1983.

398.    Defendants' retaliatory conduct, including targeting, threatening,
surveilling, arresting, detaining, jailing and prosecuting Plaintiffs without justification,
has instilled in Plaintiffs a fear of reprisal and has limited their ability to speak freely.
Plaintiffs wish to continue engaging in First Amendment-protected activities to the fullest
extent possible, but, as a result of Defendants' past, present, and likely future retaliatory
conduct, have been and are deterred from doing so.  Defendants' retaliatory conduct
would chill a person of ordinary firmness from engaging in First Amendment activities.
Defendants have chilled and continue to chill Plaintiffs' speech.

399.    Defendants' retaliatory actions have also directly and proximately caused
Plaintiffs serious financial and emotional harm including job loss, difficulty finding
employment, severe stress, anxiety, depression, loss of motivation, loss of friendships and
community ties, and more.  To redress these harms, Plaintiffs are entitled to damages,
declaratory relief, preliminary and permanent injunctive relief, costs, and attorneys' fees.

400.    Plaintiffs are also entitled to punitive damages against Defendant VanNort
and the Doe Defendants, in their individual capacities, as a result of Defendant VanNort's
reckless or callous indifference to Plaintiffs' and other racial justice protestors' federally
protected First Amendment rights.

## COUNT II – Violation of the First Amendment
## (Freedom to Petition)

401.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs in this Complaint.

402.    All Plaintiffs bring this claim against Defendant VanNort and the Doe Defendants for damages and against the City for damages, injunctive and declaratory relief.

403.    The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment of the United States Constitution.

404.    Each Plaintiff has engaged and plans to continue to engage in constitutionally-protected speech on matters of important public concern, such as racial justice and racist police violence.  Each Plaintiff has petitioned or attempted to petition the City and the OCPD for relief from its discriminatory policies and practices.  In his capacity as a journalist, Plaintiff Baker documented, recorded and disseminated Plaintiffs' efforts to petition, or attempted to do so.  Each Plaintiff has engaged in speech critical of Defendants and plans to continue to do so until such time as Defendants stop engaging in unjustified violence and discrimination against Black people and people of color.

405.    In response to Plaintiffs' petitioning activity, and Plaintiff Baker's documentation of that activity, Defendants—individually and pursuant to municipal policy, custom, or practice—not only refused to hear and respond to Plaintiffs'

complaints, but surveilled them, threatened them, and subjected them to unjustified arrest, traffic stops and/or prosecution, and the imposition of excessive bail.

406.   Defendants' acts and omissions occurred pursuant to an official municipal policy, practice, and/or custom of refusing to hear the complaints of racial justice protestors, retaliating against them for their protected First Amendment activity (including journalism) and/or engaging in viewpoint discrimination against racial justice protestors.  The City, through its final policymakers, has devised, implemented, sanctioned, ratified, and/or acted with deliberate indifference to the City Defendants' conduct.  The City's acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' First Amendment petition rights.  By acting under color of state law to deprive Plaintiffs of their First Amendment rights, Defendants have violated 42 U.S.C. § 1983.

407.   Defendants' targeting, surveilling, arresting, and detaining Plaintiffs has significantly chilled their protected speech and activity and also chilled the activity of other racial justice protesters.

408.   Plaintiffs wish to continue their petitioning activity to the fullest extent possible, but, as a result of Defendants' past, present, and likely future conduct, do not feel safe doing so.  Plaintiffs have curtailed their petitioning activity and their speech has been chilled.

409.   Defendants' actions and omissions have directly and proximately caused Plaintiffs serious financial and emotional harm including job loss, difficulty finding employment, severe stress, anxiety, depression, loss of motivation, loss of friendships and

community ties, and more.  To redress these harms, Plaintiffs are entitled to damages, declaratory relief, preliminary and permanent injunctive relief, costs, and attorneys' fees.

410.    Plaintiffs are also entitled to punitive damages against Defendant VanNort and the Doe Defendants, in their individual capacities, as a result of their reckless or callous indifference to Plaintiffs' and other racial justice protestors' federally protected First Amendment rights.

## COUNT III – Violation of the First Amendment
### (Content and/or Viewpoint Discrimination)

411.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs in this Complaint.

412.    All Plaintiffs bring this Count against Defendant VanNort and the Doe Defendants for damages and against the City for damages, injunctive and declaratory relief.

413.    Defendants discriminated against Plaintiffs based on their viewpoint in order to suppress the ability of those who had messages critical of police violence, misconduct and racial injustice generally, and the OCPD and District Attorney specifically, to speak and to disseminate those messages to the public.

414.    Defendants—individually and pursuant to municipal policy, custom, or practice—surveilled, threatened, and subjected Plaintiffs to unjustified, warrants, detention, traffic stops and/or prosecution and the imposition of excessive bail because Defendants disagreed with the political message Plaintiffs conveyed denouncing OCPD and police violence in a traditional public forum.

415.   Defendants' conduct singling out plaintiffs for expressing their viewpoints would not have occurred but for the Defendants' disagreement with Plaintiffs' protected speech (including Plaintiff Baker's journalism) critical of the OCPD and policing generally.

416.   Defendants' actions as detailed above were and are not a reasonable regulation of the time, place, or manner of Plaintiffs' protected activity.  Rather, Defendants actions were and are overbroad and unjustified and further no compelling or substantial interest.  Even if there was any such interest, Defendants' actions were and are not narrowly tailored to serve the government in a lawful manner: they were and are punitive and punishing of plaintiffs' protected speech based on Defendants' disagreement with plaintiffs' viewpoints.

417.   Defendants' acts and omissions and deliberate indifference have directly and proximately caused Plaintiffs serious financial and emotional harm including job loss, difficulty finding employment, severe stress, anxiety, depression, loss of motivation, loss of friendships and community ties, and more.  To redress these harms, Plaintiffs are entitled to damages, costs, and attorneys' fees.

418.   Plaintiffs are also entitled to punitive damages against Defendant VanNort and the Doe defendants, in their individual capacities, as a result of Defendant VanNort's reckless or callous indifference to Plaintiffs' and other racial justice protestors' federally protected First Amendment rights.

419.     As a result of Defendants' wrongful conduct, and the potential that such

conduct will recur, Plaintiffs are entitled to relief from relief from the potential that such

violations will recur in the form of declaratory and injunctive relief.

**COUNT IV – Violation of the Fourth Amendment**
**(False Arrest)**

420.     Plaintiffs reallege and incorporate by reference all of the preceding

paragraphs in this Complaint.

421.     Plaintiffs Terry, Hogsett, Baker, Nabors, and Webb bring this claim against

Defendants City of Oklahoma City and VanNort for damages.

422.     As set forth above, Defendant VanNort subjected Plaintiffs to arrest and

detention without probable cause, in violation of the Fourth Amendment.

423.     The City, through its final policymakers, sanctioned, ratified, and/or acted

with deliberate indifference to Defendant VanNort's conduct.  The City's acts and

omissions this directly and proximately caused the violation of Plaintiffs' Fourth

Amendment right to be free from unreasonable seizure.  By acting under color of state

law to deprive Plaintiffs of their Fourth Amendment rights, the City Defendants violated

42 U.S.C. § 1983.

424.     Defendants' actions and omissions have directly and proximately caused

Plaintiffs serious financial and emotional harm including job loss, difficulty finding

employment, severe stress, anxiety, depression, loss of motivation, loss of friendships and

community ties, and more.  To redress these harms, Plaintiffs are entitled to damages,

costs, and attorneys' fees.

425.     Plaintiffs are also entitled to punitive damages against Defendant VanNort, in his individual capacity, as a result of Defendant VanNort's reckless or callous indifference to Plaintiffs' Fourth Amendment rights.

**COUNT V – Violation of the Fourth Amendment**
**(Malicious Prosecution)**

426.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs in this Complaint.

427.     Plaintiffs Terry, Hogsett, Baker, Nabors, and Webb bring this claim against Defendant City of Oklahoma City and Defendant VanNort for damages.

428.     Defendants caused the Plaintiffs' continued confinement or prosecution.  In particular, Defendant Prater charged Plaintiffs with incitement to riot, a felony, resulting in their arrests and detention, based upon Affidavits of Probable Cause prepared and sworn to by Defendant VanNort that contained false statements, material misrepresentations and omissions.  In so doing, Defendant VanNort acted with malice.

429.     There was no probable cause for Plaintiffs' arrests and prosecution for incitement to riot.

430.     The original action terminated in favor of Plaintiffs.  Defendant Prater dropped the incitement to riot charges and Plaintiffs each pled guilty to obstruction of an officer, a misdemeanor.  Plaintiff Hogsett pled guilty to threatening to perform an act of violence for her conduct on June 24, which is a misdemeanor.

431.     The City, through its final policymakers, sanctioned, ratified, and/or acted with deliberate indifference to Defendant VanNort's conduct.  The City's acts and

omissions thus directly and proximately caused the violation of Plaintiffs' Fourth Amendment right to be free from unreasonable seizure.  By acting under color of state law to deprive Plaintiffs of their Fourth Amendment rights, the City Defendants violated 42 U.S.C. § 1983.

432.    Defendants' acts and omissions and deliberate indifference have directly and proximately caused Plaintiffs serious financial and emotional harm including job loss, difficulty finding employment, severe stress, anxiety, depression, loss of motivation, loss of friendships and community ties, and more.  To redress these harms, Plaintiffs are entitled to damages, costs, and attorneys' fees.

433.    Plaintiffs are also entitled to punitive damages against Defendant VanNort, in his individual capacity, as a result of Defendant VanNort's reckless or callous indifference to Plaintiffs' and other racial justice protestors' federally protected Fourth Amendment rights.

### COUNT VI – 42 U.S.C. § 1983
### (Conspiracy to Violate Constitutional Rights)

434.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs in this Complaint.

435.    All Plaintiffs bring this claim against Defendant VanNort for damages, against the City for damages, injunctive and declaratory relief, and against Defendant Prater in his individual capacity for damages.

436.    As set forth above, Defendants Prater and VanNort conspired to violate Plaintiffs' rights under the First and Fourth Amendments.  These Defendants agreed to

work together to secure the unjustified issuance of warrants, detention, jailing and prosecution of Plaintiffs for incitement to riot, a felony offense that Plaintiffs did not commit and for which there was no probable cause. Defendants worked together to justify the arrests based on Affidavits of Probable Cause containing false statements and material misrepresentations and omissions designed to manufacture probable cause that did not exist. Defendants worked together to secure unreasonably high bail so that Plaintiffs would remain in detention longer. Defendants took these unlawful actions in order to retaliate against Plaintiffs for their protected First Amendment activity and to punish them for their racial justice advocacy, which included criticizing the police for racist violence against Black people and people of color. The City, through its final policymakers, ratified and approved these actions.

437. Defendants' acts and omissions occurred pursuant to an official municipal policy, practice, and/or custom of retaliating against racial justice protestors for their protected First Amendment activity and/or engaging in viewpoint discrimination against them. In addition to helping secure the unjustified arrest and prosecution of Plaintiffs, the City, through its final policymakers, worked with Defendant Prater to issue unjustified, inflated charges against at least 28 other racial justice protestors in June 2020. The City, through its final policymakers, has devised, implemented, sanctioned, ratified, and/or acted with deliberate indifference to the violations of Plaintiffs' constitutional rights. The City's acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' First and Fourth Amendment rights. By acting under color

of state law to deprive Plaintiffs of their constitutional rights, Defendants have violated 42 U.S.C. § 1983.

438.    Defendants' actions and omissions have directly and proximately caused Plaintiffs serious financial and emotional harm including job loss, difficulty finding employment, severe stress, anxiety, depression, loss of motivation, loss of friendships and community ties, and more.  To redress these harms, Plaintiffs are entitled to damages, declaratory relief, preliminary and permanent injunctive relief, costs, and attorneys' fees.

439.    Plaintiffs are also entitled to punitive damages against Defendants VanNort and Prater, in their individual capacities, as a result of their reckless or callous indifference to Plaintiffs' and other racial justice protestors' Constitutional rights.

### COUNT VII – Violation of the Fourteenth Amendment
### (Equal Protection)

440.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs in this Complaint.

441.    Plaintiff Mack brings this claim against Defendant VanNort for damages.

442.    Defendant VanNort acted with racially discriminatory intent in a manner that had a discriminatory effect by causing a warrant to issue against Plaintiff Mack under the false allegation that he committed conduct during the mural painting encounter with Defendant Wald, when he was not even there, misidentifying him as Plaintiff Webb based on nothing more than his race.

443.    Defendants' actions and omissions have directly and proximately caused Plaintiff Mack serious financial and emotional harm including travel costs, job loss,

difficulty finding employment, stress, anxiety and more.  To redress these harms, Plaintiff is entitled to damages, declaratory relief, preliminary and permanent injunctive relief, costs, and attorneys' fees.

444.    Plaintiff Mack is also entitled to punitive damages against Defendant VanNort, in his individual capacity, as a result of Defendant VanNort's reckless or callous indifference to Mack's federally protected rights.

## RELIEF REQUESTED

Plaintiffs request that this Court issue the following relief:

a.      Declare that Defendants actions have violated (i) all Plaintiffs' rights under the First Amendment, (ii) Plaintiffs Terry, Hogsett, Baker, Nabors, and Webb's rights under the Fourth Amendment, and (iii) Plaintiff Mack's rights under the Fourteenth Amendment;

b.      Enjoin the City from engaging in the unlawful retaliatory targeting of protestors through traffic stops, threats, surveillance, intimidation, arrests, detention, and violence, and to implement safeguards sufficient to ensure these violations do not continue into the future;

c.      Enjoin the District Attorney from further prosecution against Plaintiffs or other racial justice protestors for engaging in First Amendment-protected speech;

d.      Award Plaintiffs nominal, compensatory, statutory, and punitive damages as set forth in the causes of action;

e.      Award pre-judgment and post-judgment interest to the extent allowed by law;

f.      Award Plaintiffs their costs and reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1988; and

g.      Award such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Megan Lambert
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
    OF OKLAHOMA FOUNDATION
PO Box 13327
Oklahoma City, OK 73113
mlambert@acluok.org

Anjana Malhotra*
Ranit Patel*
Karina Tefft*
Claudia Wilner*
NATIONAL CENTER FOR LAW AND
    ECONOMIC JUSTICE, INC.
50 Broadway, Suite 1500
New York, NY 10004
malhotra@nclej.org
patel@nclej.org
tefft@nclej.org
wilner@nclej.org

Thomas E. Riley*
Barron M. Flood*
HERBERT SMITH FREEHILLS NEW
    YORK LLP
450 Lexington Avenue
New York, NY 10017
thomas.riley@hsf.com
barron.flood@hsf.com

*Counsel for Plaintiffs*

*\*Pro hac vice application forthcoming*